FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

| | |
|---|---|
| DOUGLAS K. MCDANIEL; BRYAN CLARK, on behalf of themselves, all others similarly situated, and the general public, *Plaintiffs-Appellants*, <br><br> v. <br><br> WELLS FARGO INVESTMENTS, LLC, a Delaware limited liability company; WELLS FARGO BANK, NA, a National Association; WELLS FARGO ADVISORS, LLC, a Delaware limited liability company, FKA Wachovia Securities, *Defendants-Appellees*. | No. 11-17017 <br><br> D.C. No. 3:10-cv-04916-SC |

Appeal from the United States District Court
for the Northern District of California
Samuel Conti, Senior District Judge, Presiding

HOLLY HANSON, an individual, on behalf of herself and others similarly situated; JOHN RENNEL, an individual, on behalf of himself and others similarly situated,
*Plaintiffs-Appellants*,

v.

MORGAN STANLEY SMITH BARNEY LLC, a Delaware limited liability company,
*Defendant-Appellee*.

No. 11-55859

D.C. No.
2:10-cv-06945-
DSF-PLA

Appeal from the United States District Court
for the Central District of California
Dale S. Fischer, District Judge, Presiding

KIRSTEN HEILEMANN, an individual, on behalf of themselves and others similarly situated; MARCELLA LEES, an individual, on behalf of themselves and others similarly situated,
*Plaintiffs-Appellants*,

v.

BANK OF AMERICA CORPORATION, a Delaware corporation,
*Defendant-Appellee*.

No. 11-55943

D.C. No.
2:10-cv-08623-GW-JC

Appeal from the United States District Court
for the Central District of California
George H. Wu, District Judge, Presiding

MARCIA BLOEMENDAAL; DAVID
NOTRICA, on behalf of themselves
and all others similarly situated,
        *Plaintiffs-Appellants*,

        v.

MORGAN STANLEY SMITH BARNEY
LLC,
        *Defendant-Appellee*.

No. 11-55958

D.C. No.
5:10-cv-01455-
DSF-PLA

OPINION

Appeal from the United States District Court
for the Central District of California
Dale S. Fischer, District Judge, Presiding

Argued and Submitted
February 4, 2013—Pasadena, California

Filed April 9, 2013

Before: Diarmuid F. O'Scannlain, Stephen S. Trott,
and Richard R. Clifton, Circuit Judges.

Opinion by Judge O'Scannlain

## SUMMARY[*]

### Securities Law

The panel affirmed the district courts' dismissals of four class actions challenging the policies of brokerage firms that forbid their employees from opening outside trading accounts.

The panel held that the district courts correctly determined that the federal Securities Exchange Act, and related "self-regulatory organizations" rules, preempt the enforcement of California's forced-patronage statute—section 450(a) of the California Labor Code—against brokerage houses that forbid their employees from opening outside trading accounts.

### COUNSEL

Maxwell M. Blecher, Blecher & Collins, P.C., Los Angeles, CA, argued the cause and filed the briefs for the plaintiffs–appellants Holly Hanson, John Rennell, Krien Heilemann, and Marcella Lees. With him on the briefs were Alyson C. Decker, Blecher & Collins, P.C., Los Angeles, CA, Robert D. Blaiser, Jr., El Dorado Hills, CA, and Robert S. Green, James Robert Noblin, and Nicole D. Reynolds, Green Welling, P.C., San Francisco, CA.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

Marc Thierman, Thierman Law Firm, Reno, NV, argued the cause and filed the briefs for plaintiffs–appellants Marcia Bloemendaal and David Notrica. With him on the briefs were Jason J. Kuller and Joshua D. Buck, Thierman Law Firm, Reno, NV, David Spivak, The Spivak Law Firm, Beverly Hills, CA, Shaun Setareh, Law Offices of Shaun Setareh, Beverly Hills, CA, and Louis Benowitz, Law Offices of Louis Benowitz, Beverly Hills, CA.

Malcolm A. Heinecke, Munger, Tolles & Olson LLP, San Francisco, CA, argued the cause and filed the brief for defendants–appellees Wells Fargo Investments, LLC, Wells Fargo Bank, N.A., and Wells Fargo Advisors, LLC. With him on the briefs were Adam I. Kaplan, Munger, Tolles & Olson LLP, San Francisco, CA, and Terry E. Sanchez, Munger, Tolles & Olson LLP, Los Angeles, CA.

E. Joshua Rosenkranz, Orrick, Herrington & Sutcliffe LLP, New York, NY, argued the cause for defendant–appellee Morgan Stanley Smith Barney LLC. Trish M. Higgins, Orrick Herrington & Sutcliffe LLP, Menlo Park, CA, filed the brief. With them on the brief were Lynne C. Hermle, Kenneth P. Herzinger, and Robert M. Yablon, Orrick, Herrington & Sutcliffe LLP, Menlo Park, CA.

William P. Torngren, Sacramento, CA, filed the briefs for plaintiffs–appellants Douglas K. McDaniel and Bryan Clark. With him on the briefs were Gail A. Glick, Alexander Krakow + Glick, LLP, Santa Monica, CA, and Scot D. Bernstein, Law Offices of Scot D. Bernstein, Folsom, CA.

Terry E. Sanchez, Munger, Tolles & Olson LLP, Los Angeles, CA, filed the brief for defendant–appellee Bank of America Corporation.  With her on the brief were Malcolm A. Heinicke and Adam I. Kaplan, Munger, Tolles & Olson LLP, San Francisco, CA.

Allan Dinkoff, Weil, Gotshal & Manges LLP, New York, NY, filed a brief for the Securities Industry and Financial Markets Association as amicus curiae in support of defendant–appellee Morgan Stanley Smith Barney LLC. With him on the brief were Ira D. Hammerman and Kevin M. Carroll, Securities Industry and Financial Markets Association, Washington, D.C.

## OPINION

O'SCANNLAIN, Circuit Judge:

We must decide whether federal securities law preempts the enforcement of California's forced-patronage statute against brokerage houses that forbid their employees from opening outside trading accounts.

## I

## A

Federal law requires brokerage firms to take measures reasonably designed to prevent their employees from misusing material, nonpublic information.  To meet that obligation, defendants Wells Fargo Investments, Wells Fargo Bank, Wells Fargo Advisers (collectively "Wells Fargo"), Morgan Stanley Smith Barney ("Morgan Stanley"), and

Merrill Lynch, Pierce, Fenner & Smith ("Merrill Lynch")[1] have adopted policies generally forbidding their financial advisors from opening self-directed trading accounts outside the firm.[2]    At Morgan Stanley, for example, though employees "may maintain money market and open-end mutual fund accounts away from the Firm as long as the accounts do not provide the ability to purchase or sell individual securities and other financial instruments," they "generally must maintain all Employee Securities Accounts at the Firm."    To detect illicit trades, Morgan Stanley monitors in-house account transactions "for a variety of factors such as frequency of trading, potential misuse of confidential information and conflicts."    The firm grants exceptions to the in-house rule "rare[ly]" and only in the form of "express prior written approval," for which the employee must apply.    Employees permitted to open outside, self-directed accounts must "ensure that duplicate confirmations and statements [of all trades] are sent to the Firm" for review. In all relevant respects, the employee-trading policies at Wells Fargo and Merrill Lynch resemble Morgan Stanley's.[3] The firms say that they "can better prevent, detect, and

---

[1] Although Merrill Lynch is not a defendant in these cases (Bank of America, which owns Merrill Lynch, is named instead), we will follow the convention, observed in the briefs, of referring to Merrill Lynch as though it were a defendant.

[2] A trading account is "self-directed" when its holder makes securities trades himself.

[3] There is, however, one notable difference.  In 2008, Morgan Stanley began granting approval as a matter of course to California employees' requests to open accounts with outside firms, so long as those employees gave the firm duplicate statements and confirmations regarding their trades.  Morgan Stanley elevated that practice to official company policy in 2010.  It did so because it feared liability under California state law.

investigate insider trading by having employees conduct personal trading in-house," given that the companies have "more data on accounts held in-house," "can more readily correct any potential violations, for example, by reversing the trade," and "can more effectively investigate potential violations."

Plaintiffs are former employees of Wells Fargo, Morgan Stanley, and Merrill Lynch. While employed at those firms, all would have liked to open self-directed, outside accounts but were not allowed to. Douglas McDaniel and Bryan Clark are former Wells Fargo financial advisors. Holly Hanson, John Rennell, Marcia Bloemendaal, and David Notrica used to work for what is now Morgan Stanley. Kristen Heilemann and Marcella Lees worked as financial consultants and portfolio managers for Merrill Lynch.

## B

In the summer of 2010, the employees filed four class actions.[4] All rest on the same legal theory: since the firms' trading policies allow members to open self-directed trading accounts only in house, they force each "employee . . . to patronize his or her employer . . . in the purchase of [a] thing of value" and thus amount to forced patronage in violation of section 450(a) of the California Labor Code. Each firm raised the defense of preemption. They contend that section 450(a) is an obstacle to the accomplishment of a significant objective of federal securities law—namely, that brokerage firms use their discretion to adopt whatever trading polices

---

[4] On November 21, 2011, this court granted the parties' joint motion requesting that the appeals from all four cases be consolidated for briefing and oral argument before a single panel.

they think best suited to preventing insider trading and similar abuses.

**1**

In July of 2010, McDaniel and Clark sued Wells Fargo in state court. After removing to the district court for the Northern District of California, Wells Fargo moved to dismiss the employees' complaint for failure to state a claim, arguing preemption. The district court agreed with Wells Fargo that, under the doctrine of "obstacle" preemption, the "federal securities regulatory framework" precluded McDaniel and Clark's state-law claims. McDaniel and Clark timely appeal.

**2**

In August of 2010, Bloemendaal and Notrica sued Morgan Stanley in state court. After removing to the district court for the Central District of California, Morgan Stanley moved for summary judgment on the employees' forced-patronage theory, raising preemption. The court granted the motion, concluding that both the impossibility- and obstacle-preemption doctrines barred the employees' claims. Bloemendaal and Notrica timely appeal.

**3**

In August of 2010, Hanson and Rennell sued Morgan Stanley in state court. Morgan Stanley removed to the district court for the Central District of California. Invoking obstacle and impossibility preemption, Morgan Stanley moved to dismiss for failure to state a claim. The court granted the motion "for the reasons given in the Court's Order Granting

Defendant's Motion for Summary Judgment in *Bloemendaal*."  Hanson and Rennell timely appeal.

**4**

In August of 2010, Heilemann and Lees sued Merrill Lynch in state court.  After removing to the district court for the Central District of California, Merrill Lynch moved to dismiss for failure to state a claim.  The court granted the motion, agreeing that the employees' claims were precluded under the doctrine of obstacle preemption.  Heilemann and Lee timely appeal.

**II**

The employees argue that the district courts wrongly concluded that these section 450(a) suits conflict with federal law.  Enforcing California law against brokerage houses "does not pose an obstacle to the achievement of the underlying Congressional goal of preventing insider trading," they argue, "because all [section 450(a)] does is eliminate a choice of supervisory methods."  Though federal law does indeed afford brokerage firms "a choice of supervisory methods," such discretion, they say, "is not, in and of itself, a significant objective" of federal law.

**A**

Congress has imposed affirmative, supervisory duties on broker-dealers to prevent their employees from engaging in "harmful or unfair trading practices."  *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Ware*, 414 U.S. 117, 130 (1973).  The main font of these duties is the Securities Exchange Act of 1934, which, as amended, directs brokerage firms to

> establish, maintain, and enforce written
> policies and procedures reasonably designed,
> taking into consideration the nature of such
> broker's or dealer's business, to prevent the
> misuse in violation of this chapter, or the rules
> or regulations thereunder, of material,
> nonpublic information by such broker or
> dealer or any person associated with such
> broker or dealer.

Securities Exchange Act of 1934 § 15(g), 15 U.S.C. § 78o(g). The law punishes breaches of this duty harshly. If the Securities and Exchange Commission ("SEC") determines that a broker-dealer's supervisory measures are inadequate, it not only can order the firm "to take steps to effect compliance" but can also impose sanctions. 15 U.S.C. § 78u-3(a), (e). If the SEC concludes that a firm has "knowingly or recklessly failed to establish, maintain, or enforce any [required] policy or procedure," the firm faces civil penalties of up to "three times the amount of the profit gained or loss avoided" as a result of employee misconduct. 15 U.S.C. § 78u-1(a)(3), (b)(1)(B).

Congress and the SEC rely in large part on the securities exchanges themselves, known as "self-regulatory organizations" ("SROs"), to enforce the Act's requirements.[5]

---

[5] Bloemendaal and Notrica argue in their opening brief that the SROs exercise improperly delegated powers, so their directives lack the force of law. Morgan Stanley responds in part that, because the employees did not raise their delegation argument below, they waived it. In their reply brief, Bloemendaal and Notrica offer no response. We agree that the issue has been waived. *See Travelers Prop. Cas. Co. v. ConocoPhillips Co.*, 546 F.3d 1142, 1146 (9th Cir. 2008) ("[W]e will not review an issue raised for the first time on appeal, unless necessary to prevent manifest

*See Mayo v. Dean Witter Reynolds, Inc.*, 258 F. Supp. 2d 1097, 1108 (N.D. Cal. 2003).  Indeed, Congress has vested the Financial Industry Regulatory Authority (FINRA, formerly the National Association of Securities Dealers (NASD)) and the New York Stock Exchange (NYSE) with the power to promulgate rules that, once adopted by the SEC, have the force of law.[6]  15 U.S.C. § 78s(b).

Exercising that authority, the exchanges have elaborated on the Act's requirements.  For instance, one exchange rule provides that "[e]ach member [firm] shall establish and maintain a system to supervise the activities of each registered representative, registered principal, and other associated person that is reasonably designed to achieve compliance with applicable securities laws and regulations." NASD Rule 3010; *see also* NYSE Rule 342.21.  FINRA and the NYSE also require firms to certify that they have "in place processes to establish, maintain, review, test and modify written compliance policies and written supervisory procedures reasonably designed to achieve compliance with . . . federal securities laws and regulations."  FINRA Rule 3130; *see also* NYSE Rule 351.  "Final responsibility for proper supervision shall rest with the member" firm.  NASD Rule 3010(a).   NYSE Rule 407(b) goes further still, announcing what amounts to a default policy against outside trading.  "No . . . employee associated with a member or

---

injustice."); *Walsh v. Nev. Dep't of Human Res.*, 471 F.3d 1033, 1037 (9th Cir. 2006) ("[T]he issue must be raised sufficiently for the trial court to rule on it." (internal quotation marks omitted)).

[6] For that reason, SRO rules are capable of preempting state law. *Whistler Invs., Inc. v. Depository Trust & Clearing Corp.*, 539 F.3d 1159, 1168 (9th Cir. 2008).

member organization," it states, "shall establish or maintain any securities or commodities account or enter into any securities transaction with respect to which such person has any financial interest or the power . . . to make investment decisions, at another member . . . without the prior written consent" of their employer.  NYSE Rule 407(b).

## B

Federal law preempts any state law that "'stands as an obstacle to the accomplishment and execution of [its] full purposes and objectives.'"  *Williamson v. Mazda Motor of Am., Inc.*, 131 S. Ct. 1131, 1136 (2011) (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)).    "[O]bstruction preemption focuses on both the objective of the federal law and the method chosen by Congress to effectuate that objective, taking into account the law's text, application, history, and interpretation."  *Ting v. AT&T*, 319 F.3d 1126, 1137 (9th Cir. 2003).    Necessarily, "[t]he purpose of Congress is the ultimate touchstone."  *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 516 (1992) (internal quotation marks omitted); *see also Credit Suisse First Boston Corp. v. Grunwald*, 400 F.3d 1119, 1135 (9th Cir. 2005) ("This type of preemption naturally requires us to look to Congressional intent.").

## 1

The parties quarrel over a preliminary question of preemption law: whether these cases trigger *Rice v. Santa Fe Elevator Corp.*'s presumption against preemption.  331 U.S. 218, 230 (1947).  When Congress has legislated in a field which the states have traditionally occupied, "we start with the assumption that the historic police powers of the States

were not to be superseded . . . unless that was the clear and manifest purpose of Congress." *Id.* The employees characterize section 450(a) as a straightforward regulation of the labor market, an area traditionally of state concern. *See Metro. Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 756 (1985) ("States possess broad authority under their police powers to regulate the employment relationship to protect workers within the State." (internal quotation marks omitted)). The firms take a different view: although section 450(a) may operate in the ordinary case as a labor regulation, it trespasses here on the domain of securities law, the exclusive turf of Congress and the SEC. Quoting *United States v. Locke*, they note that "an 'assumption' of nonpre-emption is not triggered when the State regulates in an area where there has been a history of significant federal presence." 529 U.S. 89, 108 (2000); *see also Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71, 78 (2006) ("The magnitude of the federal interest in protecting the integrity and efficient operation of the market for nationally traded securities cannot be overstated.").

In *Wyeth v. Levine*, a drug-labeling preemption case from 2009, the Supreme Court clarified the *Rice* presumption's scope. 555 U.S. 555, 565 (2009). The presumption applies, the Court explained, "in all pre-emption cases, and particularly in those in which Congress has legislated . . . in a field which the States have traditionally occupied," even when "the Federal Government has regulated [in that field] for more than a century," as it has in the area of drug labeling. *Id.* at 565 & n.3 (internal quotation marks and citation omitted). "We rely on the presumption because respect for the states as independent sovereigns in our federal system leads us to assume that Congress does not cavalierly pre-empt state-law causes of action. The presumption thus accounts for

the historic presence of state law but does not rely on the absence of federal regulation." *Id.* at 565 n.3. Thus, whether Congress has regulated the securities industry comprehensively for fifty years or only interstitially for five is irrelevant. *See Pac. Merch. Shipping Ass'n v. Goldstene*, 639 F.3d 1154, 1166–67 (9th Cir. 2011). So long as Congress has set foot in a "field which the States have traditionally occupied," the presumption applies. *Wyeth*, 555 U.S. at 565.

Even so, the firms contend that their characterization of the "field" is the proper one. As they see it, when section 450(a) is enforced against broker-dealer trading policies, it loses its character as a traditional labor law and takes on the nature of a securities regulation, thereby falling outside the historic regulatory purview of the state. We have rejected a version of this argument twice before. *See Pac. Merch. Shipping Ass'n*, 639 F.3d at 1167 (holding that, though the state's "Vessel Fuel Rules" operate in historically federal areas such as "maritime commerce" and "conduct at sea outside of state boundaries," they "ultimately implicate the prevention and control of air pollution," an area of traditional state concern, triggering the presumption); *Chae v. SLM Corp.*, 593 F.3d 936, 944 (9th Cir. 2010) (characterizing provisions of California's unfair-competition statute, enforced against Sallie Mae's methods of administering federal student loans, as "[c]ontract and consumer protection laws [that] have traditionally been in state law enforcement hands"). We reject it again today. Section 450(a) regulates the labor market, an area traditionally of state concern.

Consequently, "[w]e begin with the presumption that Congress did not intend" to preempt section 450(a). *Pac. Merch. Shipping Ass'n*, 639 F.3d at 1167. With *Rice* in force, "we [will] not lightly decide" that the employees' claims are

preempted but will "consider carefully what Congress was trying to accomplish." *Chae*, 593 F.3d at 944.

**2**

Where, as here, federal law grants an actor "a choice," and state law "would restrict that choice," state law is preempted if preserving "that choice [was] a significant [federal] regulatory objective." *Williamson*, 131 S. Ct. at 1137. The employees argue that the objective of the Securities Exchange Act and SRO rules is not discretion but simply the prevention of insider trading and like abuses. Meanwhile, the firms argue that, here, discretion and prevention go hand in hand: "To ban brokerage firms from exercising a federally blessed option that the vast majority of them consider to be uniquely effective at combating securities fraud is to severely frustrate federal objectives." To settle this dispute, we consult the statute, rules, the regulatory scheme's "history, the agency's contemporaneous explanation, and its consistently held interpretive views." *Id.* at 1139.

Amended to encourage brokerage houses to deter insider trading, the Securities Exchange Act requires the adoption and enforcement of not just *any* employee-trading policies but specifically those designed most reasonably in light of "the nature of such broker's or dealer's business." Securities Exchange Act of 1934 § 15(g), 15 U.S.C. § 78o(g). Plainly, this language calls on securities firms to decide *for themselves* how best to monitor their employees' trading, suggesting that individually tailored policies serve as "an important means for achieving" the Act's basic goal of reducing insider trading. *Williamson*, 131 S. Ct. at 1137. Preferring flexibility to rigidity, Congress did "not set forth

specific policies and procedures that are required of every broker-dealer or investment adviser." H.R. Rep. No. 100-910, at 21, *reprinted in* 1988 U.S.C.C.A.N. 6043, 6058. Rather, Congress "recognize[d] that the question of what policies and procedures are reasonable for a particular firm may involve consideration of the differing business operations, organizational structure, scope and nature of a firm's business" and so "provid[ed] flexibility to [each] institution to tailor its policies and procedures to fit its own situation." *Id.* at 21–22. Indeed, for its part, the House Committee on Energy and Commerce went so far as to encourage the very policies that the defendants have adopted, reporting that it "would expect that a firm's supervisory system would include, at a minimum, employment policies such as those requiring personnel to conduct their securities trading through in-house accounts . . . ." H.R. Rep. No. 100-910, at 22, *reprinted in* 1988 U.S.C.C.A.N. 6043, 6059.

The SEC, charged with enforcing the Act's requirements, has also stressed the significance of broker-dealer discretion. Securities firms must have the ability to adopt "policies and procedures that take into account the special circumstances of their particular businesses and organizations." *In re Gabelli & Co., Inc.*, Exchange Act Release No. 1457, 1994 WL 684627, at *3 (Dec. 8, 1994). Indeed, this "requirement that a broker or dealer implement and maintain policies and procedures consistent with the nature of its business is *critical* to effectively preventing the misuse of material, nonpublic information." *In re Martinez*, Exhange Act Release 57,755, 2008 WL 1913369, at *4 (May 1, 2008) (emphasis added) (internal quotation marks omitted). The SEC has even noted favorably that "almost all firms require employees to maintain accounts with the firm." SEC Division of Market Regulation, Broker-Dealer Policies and Procedures Designed

to Segment the Flow and Prevent the Misuse of Material Non-Public Information, [1989–1990 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 80,621 (1990).

The SEC-adopted exchange rules further underscore the federal interest in broker-dealer flexibility. Most significantly, NYSE Rule 407(b) not only permits the adoption of policies forbidding external accounts but codifies the no-outside-account policy as a waivable default rule.[7] Additionally, NASD Rule 3040 reflects the view that "firms must be able to supervise and regulate effectively each associated person's securities activities" and must "have full discretion to utilize this authority to restrict . . . associated persons' private securities activities." New NASD Rule of Fair Practice Regulating Private Securities Transactions, 50 Fed. Reg. 41,281-01, 41282 (proposed Oct. 9, 1985). To ensure compliance, FINRA requires the chief executive of each member firm to certify that his company has taken measures reasonably designed—"in light of the nature of [the firm's] businesses and the laws and rules applicable thereto"—to prevent abuses, a duty described as "critical." FINRA Rule 3130(b), 3130.03.

We have noted that "[f]ederal regulators often include calculated flexibility within their programs without violating congressional intent to have a federal program uniformly

---

[7] McDaniel and Clark pointed out below that, unlike Wells Fargo Bank and Wells Fargo Advisors, Wells Fargo Investments was not a member of the NYSE during the relevant time, so NYSE Rule 407 did not apply to it. The district court nevertheless decided that the Securities Exchange Act and the NASD rules were enough to preclude McDaniel and Clark's section 450(a) claims under the obstacle-preemption doctrine. We agree.

control." *Chae*, 593 F.3d at 946. They have done precisely that here.

## 3

The employees make a back-up argument. Even if broker-dealer discretion is a significant objective of the federal regulatory scheme, the firms can avoid violating section 450(a) simply by offering in-house accounts to employees for "free."

Not so. The plain language of section 450(a) forbids mandatory "free" accounts just as it forbids paid ones.[8] *See Pac. Nat'l Bank v. Wozab*, 800 P.2d 557, 561 (1990) ("It is axiomatic that in the interpretation of a statute where the language is clear, its plain meaning should be followed." (internal quotation marks omitted)). An employee may not be compelled, the statute says, to patronize his employer "in the purchase of any thing of value"—period. Cal. Labor Code § 450(a). It does *not* prohibit merely compelled purchases of any thing of value *from the employer*. *See People v. Bautista*, 77 Cal. Rptr. 3d 824, 836 (Cal Ct. App. 2008) ("Under the standard rules of statutory construction, we will not read into the statute a limitation that is not there." (citing Cal. Civ Proc. Code § 1858)). An employer breaches the statute, then, in one of two ways. First, and most obviously, a company could force an employee to patronize it in the purchase of a company-provided good or service, as when Merrill Lynch requires employees interested in self-directed trading to patronize the firm in the purchase of in-house brokerage services. Second, an employer could require a worker to

---

[8] We interpret California statutes in accordance with "California principles of statutory construction." *Grunwald*, 400 F.3d at 1126.

patronize it in the purchase of a third party's good or service. As the firms point out, a "free accounts" policy would amount to forced patronage of this second sort: were Morgan Stanley to compel employees interested in self-directed trading to open their accounts in house, it still would force them to use Morgan Stanley in the purchase of goods (here, securities), regardless of whether Morgan Stanley charged its typical fees.

Resisting this reading, the employees ascribe to "patronize" a narrower definition. One is not forced to patronize an employer, they suggest, unless one is required to *pay* it for something. We disagree. To patronize is "to trade with; to frequent as a customer" or to act as "[o]ne who supports a commercial enterprise." *Webster's New International Dictionary* 1793, 1794 (2d ed. 1936). A Wells Fargo employee compelled to open a self-directed trading account in house—regardless of whether he pays the normal fees—is, quite plainly, forced to consume a Wells Fargo service. He has no choice in the matter. That he avoids the typical expenses makes him no less a Wells Fargo client, just as a consumer of free legal services is no less an attorney's client.

The second problem with the employees' reading is that it conflates what section 450(a) keeps separate: (1) patronizing and (2) purchasing something of value. If an employee could be said to patronize his employer *only* when he pays it for a good or service, then section 450(a)'s "in the purchase of any thing of value" phrase would amount to surplusage. *See People v. Woodhead*, 741 P.2d 154, 157 (Cal. 1987) ("[S]ignificance should be attributed to every word and phrase of a statute, and a construction making some words surplusage should be avoided."). The employees'

statute would literally read, "No employer may compel or coerce any employee to purchase any thing of value in the purchase of any thing of value." We must avoid such an absurdity.

For these reasons, and because in California "[a] remedial statute must be liberally construed so as . . . to suppress the mischief at which it is directed" (here, "employer coercion"), *Cal. State Rest. Ass'n v. Whitlow*, 129 Cal. Rptr. 824, 828 (Cal Ct. App. 1976) (interpreting section 450), the employees' "charge nothing" approach fails to avoid the conflict.

### III

The district courts correctly determined that the Securities Exchange Act and related SRO rules preempt the employees' forced-patronage suits.[9]

**AFFIRMED**.

---

[9] Because we agree with the district courts that the obstacle-preemption doctrine precludes enforcement of section 450(a) here, we decline to address whether, as the district courts held in *Bloemendaal* and *Hanson*, the employees' claims are also foreclosed under the impossibility-preemption doctrine.