Opinion by Judge HURWITZ; Dissent by Judge REINHARDT.
OPINION
HURWITZ, Circuit Judge:
California’s “Shark Fin Law” makes it “unlawful for any person to possess, sell, offer for sale, trade, or distribute a shark fin” in the state. Cal. Fish & Game Code § 2021(b). The plaintiffs in this action claim that the Shark Fin Law violates the Supremacy Clause by interfering with the national government’s authority to manage fishing in the ocean off the California coast, and the dormant Commerce Clause by interfering with interstate commerce in shark fins. The district court dismissed the plaintiffs’ amended complaint with prejudice, and we affirm.
I.
A.
The Magnuson-Stevens Fishery Conservation and Management Act (“MSA”), 16 U.S.C. §§ 1801-1884, “was enacted to establish a federal-regional partnership to manage fishery resources.” Nat'l Res. Def. Council, Inc. v. Daley, 209 F.3d 747, 749 (D.C.Cir.2000). Under the MSA, the federal government exercises “sovereign rights and exclusive fishery management authority over all fish, and all Continental Shelf fishery resources, within the exclusive economic zone” (“EEZ”), 16 U.S.C. § 1811(a), which extends from the seaward boundary of each coastal state to 200 miles offshore,[1] id. § 1802(11); City of Charleston v. A Fisherman’s Best, Inc., 310 F.3d 155, 160 (4th Cir.2002). The MSA expressly preserves the jurisdiction of the states over fishery management within their boundaries. See 16 U.S.C. § 1856(a)(1).
To manage fishing in the EEZ, the MSA calls for the creation of regional Fishery Management Councils (“FMCs”), composed of state and federal officials and experts appointed by the Secretary of the National Marine Fisheries Service (“NMFS”). 16 U.S.C. § 1852(b)(l)-(2). With the cooperation of “the States, the fishing industry, consumer and environmental organizations, and other interested persons,” id. § 1801(b)(5), the NMFS and FMCs develop and- promulgate Fishery Management Plans (“FMPs”) to “achieve *1140 and maintain, on a continuing basis, the optimum yield from each fishery,” id. § 1801(b)(4).[2] In the MSA, “optimum yield” means the amount of fish that “will provide the greatest overall benefit to the Nation, particularly with respect to food production and recreational opportunities, and taking into account the protection of marine ecosystems.” Id. § 1802(33); see also 50 C.F.R. § 600.310(e)(3).
B.
Shark finning is the practice of removing the fins from a living shark. The primary market for shark fins is to make shark fin soup, a traditional Chinese dish.
Even before the Shark Fin Law was passed, federal and state law prohibited finning in the waters off the California coast. In 1995, the California legislature made it “unlawful to sell, purchase, deliver for commercial purposes, or possess on any commercial fishing vessel ... any shark fin or shark tail or portion thereof that has been removed from the carcass.” Cal. Fish & Game Code § 7704(c); see 1995 Cal. Legis. Serv. ch. 371, § 1 (S.B. 458). In 2000, Congress added finning prohibitions to the MSA, which, as amended in 2011, make it unlawful to remove the fins from a shark at sea, possess detached fins aboard fishing vessels, transfer them from one vessel to another, and land them onshore. See 16 USC § 1857(1)(P); Conservation of Sharks, Pub.L. No. 111-348, § 103(a)(1), 124, Stat. 3668, 3670 (2011); Shark Finning Prohibition Act, Pub.L. No. 106-557, § 3,114 Stat. 2772 (2000).
In 2011, after finding that shark finning nonetheless continued to “cause[] tens of millions of sharks to die each year,” thereby threatening a critical element of the ocean ecosystem, and that “California is a market for shark fin” that “helps drive the practice of shark finning,” 2011 Cal. Legis. Serv. ch. 524, § 1(d), (f) (A.B.376), the California legislature passed the Shark Fin Law, which makes it a misdemeanor to possess, sell, trade, or distribute detached shark fins in California, see Cal. Fish & Game Code §§ 2021(b), 12000.
C.
The plaintiffs are associations whose members previously engaged in cultural practices and commerce involving shark fins. They claim that the Shark Fin Law is preempted by the MSA because it interferes with federal management of shark fishing in the EEZ, and with the federal government’s prerogative to balance the various statutory objectives of the MSA. They also claim the law runs afoul of the dormant Commerce Clause by interfering with commerce in shark fins between California and other states, and by stemming the flow of shark fins through California into the rest of the country.[3]
In August 2012; the plaintiffs moved the district court to preliminarily enjoin the enforcement of the Shark Fin Law. The district court denied the motion, and we affirmed, agreeing that the plaintiffs had failed to show a likelihood of success on the merits of their preemption and dormant Commerce Clause claims.[4] See Chi *1141 natown Neighborhood Ass’n v. Brown, 539 Fed.Appx. 761, 762-63 (9th Cir.2013) (mem.). On December 9, 2013, the plaintiffs filed an amended complaint. The district court granted the defendants’ motion to dismiss with prejudice on March 24, 2014.
II.
We have jurisdiction over this appeal under 28 U.S.C. § 1291. We review a district court’s grant of a motion to dismiss de novo, Cousins v. Lockyer, 568 F.3d 1063, 1067 (9th Cir.2009), and the denial of leave to amend for abuse of discretion, Toth v. Trans World Airlines, Inc., 862 F.2d 1381, 1385 (9th Cir.1988).
III.
The MSA does not have an express preemption provision. Even absent such a provision, however, a federal statute has preemptive effect if it conflicts with state law. This can occur when “compliance with both federal and state regulations is a physical impossibility,” Fla. Lime & Avocado Growers, Inc. v. Paul, 373 U.S. 132, 142-43, 83 S.Ct. 1210, 10 L.Ed.2d 248 (1963), or when a state law “stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress,” Arizona v. United States, — U.S. -, 132 S.Ct. 2492, 2501, 183 L.Ed.2d 351 (2012).[5] In assessing the preemptive force of a federal statute, the purpose of Congress, as “discerned from the language of the pre-emption statute and the statutory framework surrounding it,” is the “ultimate touchstone.” Medtronic, Inc. v. Lohr, 518 U.S. 470, 485-86, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996) (quotation marks omitted).
A presumption against preemption applies generally, but is especially strong when, as here, “Congress has legislated in a field which the states have traditionally occupied.” McDaniel v. Wells Fargo Invs., LLC, 717 F.3d 668, 674 (9th Cir.2013); see also Bayside Fish Flour Co. v. Gentry, 297 U.S. 422, 426, 56 S.Ct. 513, 80 L.Ed. 772 (1936) (explaining the historic control of states over fish in state waters); N.Y. State Trawlers Ass’n v. Jorling, 16 F.3d 1303, 1309-10 (2d Cir.1994) (“The interest of a state in regulating the taking of its fish and wildlife resources has been long established.”). Thus, the California statute cannot be set aside absent “clear evidence” of a conflict. Geier v. Am. Honda Motor Co., 529 U.S. 861, 885, 120 S.Ct. 1913, 146 L.Ed.2d 914.(2000); see also McClellan v. I-Flow Corp., 776 F.3d 1035, 1039 (9th Cir.2015) (“[T]he historic police powers of the States were not to be superseded unless that was the clear and mani *1142 fest purpose of Congress.” (alteration omitted)).
A.
Although the plaintiffs argue the Shark Fin Law interferes with the federal government’s authority under the MSA to manage shark fishing in the EEZ, they do not identify any “actual conflict between the two schemes of regulation.” Fla. Lime, 373 U.S. at 141, 83 S.Ct. 1210. To be sure, the California statute restricts certain economically viable uses for sharks that are lawfully harvested from the EEZ and landed in California. But the MSA does not mandate that a given quantity of sharks be harvested from the EEZ — and even if it did, detached fins are not the only viable use for harvested sharks. As the plaintiffs recognize, “[t]he use of approximately 95% of any legally fished shark for shark oil, shark meat, shark skin, etc. is still permitted” under the California regime. The plaintiffs point to no “clear and manifest” intent of Congress to preempt regulation such as the Shark Fin Law, McClellan, 776 F.3d at 1039; rather, they have alleged nothing more than the prospect of a “modest impediment” to general federal purposes, Pharm. Research & Mfrs. of Am. v. Walsh, 538 U.S. 644, 667, 123 S.Ct. 1855, 155 L.Ed.2d 889 (2003). This does not suffice to overcome the presumption against preemption. See Sprietsma v. Mercury Marine, 537 U.S. 51, 67, 123 S.Ct. 518, 154 L.Ed.2d 466 (2002) (finding no preemption in the absence of conflict with an “authoritative message” from Congress); P.R. Dep’t of Consumer Affairs v. Isla Petrol. Corp., 485 U.S. 495, 501, 108 S.Ct. 1350, 99 L.Ed.2d 582 (1988) (same); Fla. Lime, 373 U.S. at 146-52, 83 S.Ct. 1210 (same).[6]
B.
The plaintiffs emphasize that even when state and federal purposes overlap, a conflict in the method of achieving those purposes can be grounds for setting aside a state law. See Arizona, 132 S.Ct. at 2505 (“[C]onflict in technique can be fully as disruptive to the system Congress enacted as conflict in overt policy.”). They discern in the MSA a balancing of competing objectives in fishery management and a corresponding congressional intent to preclude state legislation that promotes one of these objectives — conservation—over others. See, e.g., id. (finding state law preempted from interfering “with the careful balance struck by Congress with respect to unauthorized employment” of undocumented workers).
The MSA indeed recognizes various competing values. See 16 U.S.C. *1143 § 1801(b) (listing “conserving] and managing] the fishery resources found off the coasts of the United States,” “promoting] domestic commercial and recreational fishing under sound conservation and management principles,” and “encouraging] the development by the United States fishing industry of fisheries which are currently underutilized or not utilized ... in a non-wasteful manner” as objectives of the MSA). Among them, however, conservation is paramount. See Nat. Res. Def. Council, Inc. v. Nat’l Marine Fisheries Serv., 421 F.3d 872, 879 (9th Cir.2005) (“The purpose of the Act is clearly to give conservation of fisheries priority over short-term economic interests.”); Daley, 209 F.3d at 753 (“[U]nder the ... [MSA], the Service must give priority to conservation measures.”). Indeed, in the particular context of shark fishing, the amendments to the MSA addressing finning make the primacy of conservation unambiguous. See 16 U.S.C. § 1857(1)(P). This is, accordingly, not the rare circumstance in which a state law interferes with a “deliberate effort to steer a middle path,” Crosby v. Nat’l Foreign Trade Council, 530 U.S. 363, 378, 120 S.Ct. 2288, 147 L.Ed.2d 352 (2000) (quotation marks omitted), or to strike a “careful balance,” Arizona, 132 S.Ct. at 2505.
The MSA’s provision for broad state-level participation in the implementation of the statutory objectives further undermines any inference of interference with Congress’s method. See, e.g., 16 U.S.C. § 1852(a)(2) (“Each [FMC] shall reflect the expertise and interest of the several constituent States in the ocean area over which such Council is granted authority:”); see also id. § 1853(b)(3)(B) (permitting FMPs to limit commerce in fish caught within the EEZ “consistent with any applicable ... State safety and quality requirements”); id. § 1856(a)(1) (“[N]othing in this chapter shall be construed as extending or diminishing the jurisdiction or authority of any State within its boundaries.”); Daley, 209 F.3d at 749 (“The Fishery Act was enacted to establish a federal-regional partnership to manage fishery resources.”). Courts have found conflicts between state and federal schemes with overlapping purposes when the federal scheme is comprehensive and exclusive, see, e.g., Arizona, 132 S.Ct. at 2504-05 (immigration); Crosby, 530 U.S. at 380-88, 120 S.Ct. 2288 (international sanctions), but not when, as here, the federal scheme is cooperative, see Wyeth v. Levine, 555 U.S. 555, 575, 129 S.Ct. 1187, 173 L.Ed.2d 51 (2009) (“The ease for federal pre-emption is particularly weak where Congress has indicated its awareness of the operation of state law in a field of federal interest, and has nonetheless decided to stand by both concepts and to tolerate whatever tension there is between them.” (alteration omitted)); DeHart v. Town of Austin, Ind., 39 F.3d 718, 722 (7th Cir.1994) (“[G]iven the clear expressions of Congressional intent to foster cooperation with state and local governments and the different, albeit overlapping, purposes behind the [federal] Act and the ... Ordinance, we discern no Congressional intent to ban state or local legislation.... ”).
C.
The plaintiffs’ attempt to draw a negative inference from Congress’s failure in the MSA to address on-land activities related to finning, see 18 U.S.C. § 1857(1)(P) (referring to activities at sea, aboard fishing vessels, and during landing), is similarly meritless. Silence, without more, does not preempt — “a clear and manifest purpose of pre-emption is always required.” Isla Petrol., 485 U.S. at 503, 108 S.Ct. 1350 (quotation marks omitted). There is no “authoritative federal determination” that on-land activities are “best left *1144 un regulated.” Id.[7] To the contrary, the federal scheme expressly preserves the ability of states to regulate fishing-related activities within their boundaries. See 16 U.S.C. § 1856(a)(1).
D.
The plaintiffs amended their original complaint after we remanded the case upon affirming the denial of a preliminary injunction. At the hearing on the motion to dismiss the amended complaint, the district court asked plaintiffs’ counsel during the discussion of the preemption claim whether “you’ve got the complaint where you want it,” and counsel responded affirmatively. Based on this representation, the court found that a second round of amendments would be futile and granted the motion to dismiss with prejudice.
The plaintiffs assert for the first time on appeal that they could plead additional facts to support the preemption claim, and ask us to find that the district court abused its discretion in failing to grant leave sua sponte. Even making the charitable assumption that this argument was preserved for appeal, see Alaska v. United States, 201 F.3d 1154, 1163-64 (9th Cir.2000) (“Where a party does not ask the district court for leave to amend, the request on appeal to remand with instructions to permit amendment comes too late.” (alterations and quotation marks omitted)); Reyn’s Pasta Bella, LLC v. Visa USA Inc., 442 F.3d 741, 749 (9th Cir.2006) (relying on Alaska for the proposition that “we generally will not remand with instructions to grant leave to amend unless the plaintiff sought leave to amend below”), we cannot conclude on this record that the district court abused its discretion in dismissing with prejudice.[8]
“Although leave to-amend ‘shall be freely given when justice so requires,’ it may be denied if the proposed amendment either lacks merit or would not serve any purpose because to grant it would be futile in saving the plaintiffs suit.” Universal Mortg. Co. v. Prudential Ins. Co., 799 F.2d 458, 459 (9th Cir.1986) (quoting Fed. R.Civ.P. 15(a)). The first amended complaint makes no allegations of a direct conflict between the California statute and any unambiguous federal mandate. At oral argument on this appeal, plaintiffs’ counsel asserted that the plaintiffs could remedy this defect by alleging that state bans on commerce in shark fins affect the ability of commercial fishers to reap the optimum yields prescribed in FMPs for shark harvests. But the MSA does not preempt a state law simply because it may affect the realization of optimum yields — if *1145 that were- so, a wide array of state regulations affecting commercial fishing, such as taxes or labor laws, would be potentially suspect. Indeed, Congress expressly foreclosed any interpretation of optimum yield that would have such a broad preemptive effect by preserving state jurisdiction over commerce in fish products within state borders. See 16 U.S.C. § 1856(a)(1).
The plaintiffs concede that no provision of federal law affirmatively guarantees the right to use or sell shark fins onshore, and they do not dispute that there are commercially viable uses for sharks besides their detached fins. That resolves the preemption issue. See Fla. Lime, 373 U.S. at 146-47, 83 S.Ct. 1210 (“[W]e are not to conclude that Congress legislated the ouster of this California statute ... in the absence of an unambiguous congressional mandate to that effect.”). Leave to amend would therefore be futile. Cf. ReadyLink Healthcare, Inc. v. State Comp. Ins. Fund, 754 F.3d 754, 761-62 (9th Cir.2014) (“Preemption is almost always a legal question, the resolution of which is rarely aided by development of a more complete factual record.” (quotation marks omitted)).[9]
IV.
“The Supreme Court has adopted a two-tiered approach to analyzing state economic regulation under the Commerce Clause.” Ass’n des Eleveurs de Canards et d’Oies du Quebec v. Harris, 729 F.3d 937, 948 (9th Cir.2013) (quotation marks omitted), cert. denied, —• U.S. -, 135 S.Ct. 398, — L.Ed.2d - (2014). If a state statute “directly regulates or discriminates against interstate commerce, or ... its effect is to favor instate economic interests over out-of-state interests,” it is “struck down ... without further inquiry.” Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth., 476 U.S. 573, 579, 106 S.Ct. 2080, 90 L.Ed.2d 552 (1986). When, however, a state statute has only indirect effects on interstate commerce and regulates evenhandedly, it violates the Commerce Clause only if “the burdens of the statute so outweigh the putative benefits as to make the statute unreasonable or irrational.” UFO Chuting of Haw., Inc. v. Smith, 508 F.3d 1189, 1196 (9th Cir.2007) (alteration omitted).
A.
The plaintiffs claim the Shark Fin Law is .per se invalid under the Commerce Clause because it regulates extra-territorially by curbing commerce in shark fins between California and out-of-state destinations, and by preventing the flow of shark fins through California from one out-of-state destination to another. But a state may regulate commercial relationships “in which at least one party is located in California.” Gravquick A/S v. Trimble Navigation Int’l, Ltd., 323 F.3d 1219, 1224 (9th Cir.2003). And even when state law has significant extraterritorial effects, it passes Commerce Clause muster when, as here, those effects result from the regulation of in-state conduct. See Rocky Mtn. Farmers Union v. Corey, 730 F.3d 1070, 1101-04 (9th Cir.2013) (upholding California statute imposing fuel standards that affect out-of-state fuel producers because the standard applies only to fuels con *1146 sumed in California), cert. denied, — U.S. -, 134 S.Ct. 2875, 189 L.Ed.2d 835 (2014); Ass’n des Eleveurs, 729 F.3d at 948-51 (upholding California statute banning sale of products from force-fed birds, even though it affected out-of-state producers and exports from California); cf. Sam Francis Found. v. Christies, 784 F.3d 1320, 1323-24 (9th Cir.2015) (en banc) (invalidating a California statute that “facially regulates a commercial transaction that takes place wholly outside of the State’s borders” (quotation marks omitted)). Thus, nothing about the extraterritorial reach of the Shark Fin Law renders it per se invalid.
The plaintiffs’ reliance on Healy v. Beer Institute, Brown-Forman Distillers Corp. v. New York State Liquor Authority, and Baldwin v. G.A.F. Seelig, Inc. is misplaced. In each of those cases, the Supreme Court struck down price-control or price-affirmation statutes that had the effect of preventing producers from pricing products independently in neighboring states. See Healy, 491 U.S. 324, 326, 334, 109 S.Ct. 2491, 105 L.Ed.2d 275 (1989) (Connecticut statute requiring beer distributors to affirm that Connecticut prices were at least as low as prices in other states); Brown-Forman, 476 U.S. at 575, 582-83, 106 S.Ct. 2080 (New York statutes barring distillers from selling liquor at prices higher than prices in other states); Baldwin, 294 U.S. 511, 521-22, 55 S.Ct. 497, 79 L.Ed. 1032 (1935) (New York statute prohibiting sale of milk in New York if acquired from Vermont farmers at price lower than price available to New York farmers). We have recognized the sui generis effect on interstate commerce of such price-control regimes and the correspondingly limited scope of these cases. See Ass’n des Eleveurs, 729 F.3d at 951 {“Healy and Baldwin are not applicable to a statute that does not dictate the price of a product and does not tie the price of its in-state products to out-of-state prices.” (alteration and quotation marks omitted) (quoting Walsh, 538 U.S. at 669, 123 S.Ct. 1855)). The Shark Fin Law does not fix prices in other states, require those states to adopt California standards, or attempt to regulate transactions conducted wholly out of state, and the price-control cases are therefore inapposite. See Rocky Mtn., 730 F.3d at 1102-03.
B.
The plaintiffs claim that even if the Shark Fin Law is not an impermissible direct regulation of extraterritorial conduct, it should be struck down under Pike v. Bruce Church, Inc., because “the burden [it] impose[s] on [interstate] commerce is clearly excessive in relation to the putative local benefits.” 397 U.S. 137, 142, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970). Our precedents, however, preclude any judicial “assessment of the benefits of [a state] law[ ] and the ... wisdom in adopting” it unless the state statute either discriminates in favor of in-state commerce or imposes a “significant burden on interstate commerce.” Nat’l Ass’n of Optometrists & Opticians v. Harris, 682 F.3d 1144, 1156 (9th Cir.2012); see also Ass’n des Eleveurs, 729 F.3d at 951-52. Here, the plaintiffs do not allege the Shark Fin Law has any discriminatory effect, and they cannot establish a significant burden on interstate commerce.
“[0]nly a small number of ... cases invalidating laws under the dormant Commerce Clause have involved laws that were genuinely nondiscriminatory....” Nat’l Ass’n of Optometrists, 682 F.3d at 1150 (quotation marks omitted). These cases address state “regulation of activities that are inherently national or require a uniform system of regulation,” id. at 1148— most typically, interstate transportation, see, e.g., Raymond Motor Transp., Inc. v. Rice, 434 U.S. 429, 447-48, 98 S.Ct. 787, 54 *1147 L.Ed.2d 664 (1978) (state regulation of truck length); see also Ass’n des Eleveurs, 729 F.3d at 952 (“[E]xamples of courts finding uniformity necessary fall into the categories of transportation or professional sports leagues.” (alteration and quotation marks omitted)).
The Shark Fin Law does not interfere with activity that is inherently national or that requires a uniform system of regulation. The purpose of the Shark Fin Law is to conserve state resources, prevent animal cruelty, and protect wildlife and public health. See 2011 Cal. Legis. Serv. ch. 524, § 1 (A.B.376) (listing purposes). These are legitimate matters of local concern. See, e.g., Merrifield v. Lockyer, 547 F.3d 978, 986 (9th Cir.2008); UFO Chuting, 508 F.3d at 1196. And to the extent the Shark Fin Law is effectively a means of ocean fishery management, fishery management is an inherently cooperative endeavor— with state and federal jurisdiction over the oceans divided according to distance from shore, see 16 U.S.C. §§ 1802(11), 1811(a), 1856(a)(1), and with state and federal cooperation contemplated even in the management of federal waters, see, e.g., id. § 1852(a)(2). There is, accordingly, no significant interference with interstate commerce. See Ass’n des Eleveurs, 729 F.3d at 952; Nat’l Ass’n of Optometrists, 682 F.3d at 1156.
“Because the [Shark Fin Law does] not impose a significant burden on interstate commerce, it would be inappropriate for us to determine [its] constitutionality ... based on our assessment of the benefits of th[e] law[ ] and the State’s wisdom in adopting [it],” or the availability of less-burdensome alternatives. Nat’l Ass’n of Optometrists, 682 F.3d at 1156-57; see also Ass’n des Eleveurs, 729 F.3d at 952 (finding an inquiry into “whether the benefits of the challenged laws are illusory” unwarranted because the regulation of the foie gras market is not inherently national).[10]
y.
We AFFIRM the judgment of the district court.

. In California, the seaward boundary is three miles offshore. Vietnamese Fishermen Ass’n of Am. v. Cal. Dep’t of Fish & Game, 816 F.Supp. 1468, 1470 (N.D.Cal.1993).

. See, e.g., Fishery Management Plan for U.S. West Coast Fisheries for Highly Migratory Species, Pacific Fishery Management Council (July 2011), available at http://www.pcouncil. org/wp-content/uploads/HMS-FMP-Jull 1 .pdf.

. The plaintiffs also claimed below that the Shark Fin Law violates the Equal Protection Clause, but they abandoned this claim at oral argument.

.The federal government raised tentative preemption concerns in an untimely amicus brief filed with this Court while the appeal from the denial of the preliminary injunction was before us. See Chinatown Neighborhood Ass’n v. Brown, 539 Fed.Appx. 761, 763 (9th Cir.2013) (mem.). That brief relied in part on an NMFS notice of proposed rulemaking— which proposed regulations that have not been adopted — suggesting that under certain *1141 circumstances, the MSA would preempt state laws that have the effect of regulating fishing within the EEZ. See Magnuson-Stevens Act Provisions; Implementation of the Shark Conservation Act of 2010, 78 Fed.Reg. 25,-685, 25,687 (May 2, 2013). We declined to consider the federal government’s position on preemption in determining whether the district court had abused its discretion in denying preliminary injunctive relief because that position was first presented in an untimely amicus brief on appeal, but said that the federal government could “rais[e] these arguments in the permanent injunction proceedings.” Chinatown Neighborhood Ass’n, 539 Fed.Appx. at 763. The federal government did not file an amicus brief in connection with the motion to dismiss or the present appeal, but the defendants have submitted correspondence from the NMFS stating that the Shark Fin Law “is not preempted by the Magnuson-Stevens Act, as amended.” In light of our conclusions below, we need not rely on this position.

. Under the doctrine of “field preemption,” state law is preempted if it regulates “conduct in a field that Congress, acting within its proper authority, has determined must be regulated by its exclusive governance.” Arizona, 132 S.Ct. at 2501. The plaintiffs have abandoned any claim of field preemption.

. The cases relied upon by the plaintiffs that invalidate state regulations with effects on fishing in the EEZ are unpersuasive because in each case, the invalidated regulations either directly proscribed what federal law affirmatively allowed, see A Fisherman’s Best, 310 F.3d at 173-76 (Fourth Circuit case finding preempted a city resolution forbidding access to ports for vessels using longline tackle, which was the only fishing method authorized by the applicable FMP), or directly banned activity within the EEZ that was legal under federal law, see Vietnamese Fishennen Ass’n, 816 F.Supp. at 1475 (concluding an FMP permitted the use of gill nets in certain places within the EEZ, and invalidating a California proposition banning the use of gill nets in the EEZ); Bateman v. Gardner, 716 F.Supp. 595, 597-98 (S.D.Fla.1989) (finding preempted a Florida statute that banned fishing in portions of the EEZ where federal law allowed it), aff'd, 922 F.2d 847 (11th Cir. 1990) (mem.). In Southeastern Fisheries Association v. Chiles, a case cited in the dissent, the Eleventh Circuit suggested in dicta that state-law daily quotas on landing Spanish Mackerel would interfere with a federal annual quota on catch of that fish in the EEZ. 979 F.2d 1504, 1509-10 (11th Cir.1992). There too, state law directly conflicted with what federal law allowed.

. The plaintiffs rely on regulations that limit the circumstances under which sharks may be sold on land. See 50 C.F.R. § 635.31(c)(1), (5). But these regulations limit, rather than encourage, commerce in sharks. Cf. 16 U.S.C. § 1853(b)(3) (permitting FMPs to "establish specified limitations which are necessary and appropriate for the conservation and management of the fishery on the ... sale of fish caught during commercial, recreational, or charter fishing" (emphasis added)). The plaintiffs also rely on a statement by Representative George Miller during floor debates on the federal finning prohibition act that the "Act will not prevent United States fishermen from harvesting sharks, bringing them to shore, and then using the fins or any other part of the shark.” 146 Cong. Rec. HI 1571 (Oct. 30, 2000). But a lone statement in the legislative history is not a "clear and manifest” expression of Congress’s intent to preempt, and in any event, this statement merely describes the limits of federal law.

. The dissent correctly notes the "strong showing” required in the district court to justify dismissal with prejudice, but ignores the deferential abuse-of-discretion standard governing our review of the district court's failure to grant leave to amend. At the very least, it is even more difficult to perceive an abuse of discretion when the plaintiffs never sought leave to amend below.

. Our conclusion is bolstered by the posture in which the request to amend was made. The original complaint was filed three years ago, since then, there has been ample opportunity to explore the scope of the preemption claim, including in litigating the preliminary injunction and the appeal from the denial of the preliminary injunction. The plaintiffs had the benefit of this litigation, and its resolution, before filing the first amended complaint. Cf. AmerisourceBergen Corp. v. Dialysist W., Inc., 465 F.3d 946, 953-54 (9th Cir.2006) (affirming denial of leave to amend based on delay between learning of basis for amendment and seeking leave).

. Because none of the plaintiffs' constitutional claims survive the motion to dismiss, the district court properly dismissed the claim under 42 U.S.C. § 1983. See West v. Atkins, 487 U.S. 42, 48, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988).