**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| ARLENE ROSENBLATT, an individual, on behalf of herself and all others similarly situated, *Plaintiff-Appellant*, v. CITY OF SANTA MONICA, a municipal corporation; THE CITY COUNCIL OF THE CITY OF SANTA MONICA, a governing body, *Defendants-Appellees*. | No. 17-55879 D.C. No. 2:16-cv-04481-ODW-AGR OPINION |

Appeal from the United States District Court
for the Central District of California
Otis D. Wright II, District Judge, Presiding

Argued and Submitted October 12, 2018
Pasadena, California

Filed October 3, 2019

Before: Mary M. Schroeder and Jacqueline H. Nguyen,
Circuit Judges, and Michael H. Simon,[*] District Judge.

Opinion by Judge Nguyen

---

[*] The Honorable Michael H. Simon, United States District Judge for the District of Oregon, sitting by designation.

## SUMMARY[**]

### Civil Rights

The panel affirmed the district court's dismissal of a putative class action against the City of Santa Monica and Santa Monica City Council alleging that the City's short-term vacation rental ordinance violates the dormant Commerce Clause.

Santa Monica's ordinance prohibits property rentals of 30 days or less with an exception for rentals where a primary resident remains in the dwelling. Plaintiff is a Santa Monica resident and homeowner who, prior to the passage of the ordinance, rented out her house on Airbnb.

The panel first held that the ordinance is not a per se violation of the dormant Commerce Clause because it does not directly regulate interstate commerce. At most, the ordinance has an interstate effect because it makes travel lodging to Santa Monica less accessible, available and affordable. Moreover, the ordinance penalizes only conduct in Santa Monica, regardless of whether the visitors are in-state or out-of-state. The panel rejected plaintiff's argument that the ordinance violates the dormant Commerce Clause by directly regulating booking and payment transactions that may occur entirely out-of-state. The panel held that the ordinance applies evenhandedly and does not directly restrain interstate commerce although it may regulate transactions with an interstate component. The panel further held that nothing in the ordinance suggested that its

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

advertising ban was intended to have extraterritorial application.

The panel held that the ordinance does not discriminate against interstate commerce by favoring in-state over out-of-state interests. The panel determined that Santa Monica's ban on vacation rentals applies in the same manner to persons nationwide, including Santa Monica residents who may be interested in renting a vacation home from another resident. The panel further noted that the ordinance applies equally to renters and property owners from outside California, California residents outside of Santa Monica, and Santa Monica residents. The panel held that the complaint did not adequately allege that the ordinance increases the relative market share of local businesses or that it has a net negative effect on commerce outside of California. Finally, the panel held that the complaint failed to plausibly allege that the home-sharing exception obviously advantages Santa Monica residents at the expense of out-of-state homeowners.

The panel held that the complaint failed to plausibly allege that the ordinance unduly burdens interstate commerce through its incidental effects. Because plaintiff failed to show a high burden on interstate commerce – and, at most, suggested some negligible burden on the local economy of Santa Monica – the complaint could not meet the standard established in *Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970). Thus, the complaint's allegations did not adequately demonstrate how the alleged burden on interstate commerce would clearly exceed the stated benefits of the ordinance.

**COUNSEL**

Robert L. Esensten (argued) and Jordan S. Esensten, Esensten Law, Los Angeles, California, for Plaintiff-Appellant.

Yibin Shen (argued), Chief Deputy City Attorney; Heidi Von Tongeln and Michael R. Cobden, Deputy City Attorneys; Lane Dilg, City Attorney; Santa Monica City Attorney's Office, Santa Monica, California; for Defendants-Appellees.

**OPINION**

NGUYEN, Circuit Judge:

This case involves the perennial clash between a city's exercise of traditional police powers in regulating land use and the rights of property owners to use their property as they see fit. But this familiar problem has a not-so-familiar backdrop: online marketplaces—such as Airbnb and HomeAway—where travelers can rent privately-owned residential properties as vacation rentals.

Santa Monica resident Arlene Rosenblatt used to rent out her house on Airbnb when she and her husband went on vacation. Santa Monica passed an ordinance prohibiting property rentals of 30 days or less ("vacation rentals") with an exception for rentals where a primary resident remained in the dwelling ("home sharing"). Rosenblatt brought a putative class action against the city of Santa Monica and Santa Monica's City Council (collectively, Santa Monica), arguing that the ordinance violated the dormant Commerce

Clause.   Rosenblatt contended that the ordinance directly and indirectly regulated and burdened interstate commerce.

The district court dismissed the amended complaint without leave to amend, concluding that Rosenblatt failed to allege a Commerce Clause violation as a matter of law.  We have jurisdiction under 28 U.S.C. § 1291.  Reviewing de novo, *see Chinatown Neighborhood Ass'n v. Harris*, 794 F.3d 1136, 1141 (9th Cir. 2015), we affirm.

## I.   FACTUAL            AND            PROCEDURAL BACKGROUND

Santa Monica has implicitly prohibited short-term property rentals in residential zones since at least 1988.[1]  In 2015, Santa Monica explicitly codified this zoning prohibition on vacation rentals in an ordinance.  *See* Santa Monica Ordinance 2484 (May 12, 2015) (codified as amended at Santa Monica Mun. Code §§ 6.20.010–6.20.100).[2]  The ordinance created an exception for home sharing to allow residents to "host visitors in their homes, for compensation . . . , while at least one of the dwelling unit's primary residents lives on-site, in the dwelling unit, throughout the visitors' stay."  Santa Monica Mun. Code § 6.20.010(a).

---

[1] Santa Monica's zoning ordinance authorizes property in residential zones to be used for single- and multiple-family "dwelling units," and defines "dwelling" as "[a] structure or portion thereof which is used principally for residential occupancy."  The zoning ordinance prohibits uses that are not specifically authorized.  Single-family "R1" zones do not allow transient occupancy uses—such as bed and breakfasts, hotels, and motels, while higher-density residential zones allow some or all of those uses with a conditional use permit.

[2] A copy of the ordinance is attached as Appendix A.

The ordinance defines vacation rentals to cover situations where the unit owner or lessee rents out the property for "exclusive transient use," meaning that "none of the dwelling unit's primary residents lives on-site . . . throughout any visitor's stay." *Id.* § 6.20.010(f). Violations of the vacation rental ordinance are punishable by a fine not exceeding $500 and up to six months in jail. *Id.* § 6.20.100(a).

In enacting this ordinance, the Santa Monica City Council sought to preserve the city's "available housing stock and the character and charm which result, in part, from cultural, ethnic, and economic diversity of its resident population," and "its unique sense of community which derives, in large part, from residents' active participation in civic affairs, including local government, cultural events, and educational endeavors." Santa Monica Ordinance 2484, pmbl. The city council stressed that "vacation rentals . . . are detrimental to the community's welfare and are prohibited by local law, because occupants of such vacation rentals, when not hosted, do not have any connections to the Santa Monica community and to the residential neighborhoods in which they are visiting" and "the presence of such visitors within the City's residential neighborhoods can sometimes disrupt the quietude and residential character of the neighborhoods." *Id.*

Rosenblatt is a Santa Monica resident and homeowner who, prior to the ordinance, rented out her house on Airbnb for $350 per night when she and her husband traveled. After the city of Santa Monica enacted the ordinance, Rosenblatt sued the city and its city council to enjoin the ordinance and recover damages on behalf of herself and a class of similarly situated individuals, claiming that the ordinance violates the dormant Commerce Clause.

Rosenblatt alleges that the development of "an online marketplace to list privately-owned properties for rent on a short-term basis" allowed tourists to opt for less expensive residential rentals over "the ultra-luxurious, highly occupied, and pricey hotels in the City." According to Rosenblatt, Santa Monica's real reason for enacting the vacation rental ordinance was to prop up demand for the city's high-end hotels and thereby reverse a decline in revenue from the city's 14% transient occupancy tax, which the hotels paid but the vacation rentals did not. The district court dismissed Rosenblatt's initial complaint for failure to state a claim, and Rosenblatt filed her first amended complaint. The district court again dismissed Rosenblatt's amended dormant Commerce Clause claims under Federal Rule of Civil Procedure 12(b)(6), this time without leave to amend. Rosenblatt appeals.

## II.  DISCUSSION

### A.  The dormant Commerce Clause

The Commerce Clause affirmatively grants to Congress the power to regulate interstate commerce. In order to advance national solidarity and prosperity, the Supreme Court has given meaning to the Clause's "great silences." *H.P. Hood & Sons, Inc. v. Du Mond*, 336 U.S. 525, 535 (1949). The Court refers to these silences—the Clause's "negative" aspect—as the dormant Commerce Clause. *See Tenn. Wine & Spirits Retailers Ass'n v. Thomas*, 139 S. Ct. 2449, 2459 (2019).

The dormant Commerce Clause "denies the States the power unjustifiably to discriminate against or burden the interstate flow of articles of commerce." *Or. Waste Sys., Inc. v. Dep't of Envtl. Quality*, 511 U.S. 93, 98 (1994). "The primary purpose of the dormant Commerce Clause is to

prohibit 'statutes that discriminate against interstate commerce' by providing benefits to 'in-state economic interests' while 'burdening out-of-state competitors.'" *Ass'n des Éleveurs de Canards et d'Oies du Québec v. Harris*, 729 F.3d 937, 947 (9th Cir. 2013) (quoting *Nat'l Ass'n of Optometrists & Opticians v. Harris*, 682 F.3d 1144, 1148 (9th Cir. 2012)); *see also C & A Carbone, Inc. v. Town of Clarkstown*, 511 U.S. 383, 390 (1994) (explaining that the "central rationale" of the dormant Commerce Clause "is to prohibit state or municipal laws whose object is local economic protectionism, laws that would excite those jealousies and retaliatory measures the Constitution was designed to prevent").

In reviewing challenges to local regulations under the dormant Commerce Clause, we follow a two-tiered approach:

> [1] When a state statute directly regulates or discriminates against interstate commerce, or when its effect is to favor in-state economic interests over out-of-state interests, we have generally struck down the statute without further inquiry. [2] When, however, a statute has only indirect effects on interstate commerce and regulates evenhandedly, we have examined whether the State's interest is legitimate and whether the burden on interstate commerce clearly exceeds the local benefits.

*Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth.*, 476 U.S. 573, 579 (1986) (citations omitted); *see also S.D. Myers, Inc. v. City & County of San Francisco*, 253 F.3d 461, 466 (9th Cir. 2001). "It is well settled that a state

regulation validly based on the police power does not impermissibly burden interstate commerce where the regulation neither discriminates against interstate commerce nor operates to disrupt its required uniformity." *Constr. Indus. Ass'n of Sonoma Cty. v. City of Petaluma*, 522 F.2d 897, 909 (9th Cir. 1975); *see also Village of Euclid v. Ambler Realty Co.*, 272 U.S. 365, 390 (1926) (upholding zoning regulations that excluded hotels from residential areas).

To succeed on her facial challenge under the dormant Commerce Clause, Rosenblatt must establish "that no set of circumstances exists under which the [Ordinance] would be valid. The fact that [the Ordinance] might operate unconstitutionally under some conceivable set of circumstances is insufficient to render it wholly invalid." *S.D. Myers, Inc.*, 253 F.3d at 467 (alterations in original) (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)). Because of this high burden, "we construe the Ordinance narrowly and resolve any ambiguities in favor of the interpretation that most clearly supports constitutionality." *Id.* at 468.

## B. The complaint does not allege a per se violation of the dormant Commerce Clause

### 1. The ordinance does not directly regulate interstate commerce

A per se violation of the dormant Commerce Clause occurs "[w]hen a state statute directly regulates or discriminates against interstate commerce, or when its effect is to favor in-state economic interests over out-of-state interests." *Daniels Sharpsmart, Inc. v. Smith*, 889 F.3d 608, 614 (9th Cir. 2018) (alteration in original) (quoting *Brown-Forman Distillers Corp.*, 476 U.S. at 579). A local law directly regulates interstate commerce when it "directly

affects transactions that take place across state lines or entirely outside of the state's borders." *Id*. (quoting *S.D. Myers, Inc.*, 253 F.3d at 467).

### a.   Vacation rentals

Rosenblatt argues that the ordinance directly regulates interstate commerce because 95% of Santa Monica vacation rentals involve an out-of-state party.  Although we agree that vacation rentals generally implicate interstate commerce, *see Camps Newfound/Owatonna, Inc. v. Town of Harrison*, 520 U.S. 564, 573 (1997), the relevant question here is whether the ordinance *directly* regulates the interstate or extraterritorial aspect of the vacation rental business.  *See Chinatown Neighborhood Ass'n*, 794 F.3d at 1145 ("[E]ven when state law has significant extraterritorial effects, it passes Commerce Clause muster when, as here, those effects result from the regulation of in-state conduct.").

Rosenblatt relies heavily on *Camps*, but that case addressed whether state law discriminated against interstate commerce, not whether it *directly regulated* it.  There, a state statute provided a tax break to charitable institutions but expressly exempted institutions that were "conducted or operated principally for the benefit of persons who are not residents" of the state.  520 U.S. at 568.  The Supreme Court concluded that "[t]he services that [the camp] provides to its principally out-of-state campers clearly have a substantial effect on commerce, as do state restrictions on making those services available to nonresidents."  *Id.* at 574.  However, the Court recognized that "the discriminatory burden is imposed on the out-of-state customer indirectly," not directly.  *Id*. at 580.

When this court has considered laws directly regulating interstate commerce, we have also distinguished between

laws that directly regulate extraterritorial activity and laws that indirectly regulate the effects of commerce. In *Chinatown Neighborhood Association*, we held that a state law banning shark fin trading survived a dormant Commerce Clause challenge even though the law had direct effects on commerce outside the state. 794 F.3d at 1145. We contrasted extraterritorial effects that "result from the regulation of in-state conduct," *id.*, with legislation that directly regulates interstate commerce by either "fix[ing] prices in other states, requir[ing] those states to adopt California standards, or attempt[ing] to regulate transactions conducted wholly out of state," *id.* at 1146.

Here, Santa Monica's ordinance does not directly regulate interstate commerce by prohibiting vacation rentals for Santa Monica homes. At most, Rosenblatt alleges that the ordinance has an interstate effect because it "makes travel lodging in Santa Monica less accessible, available, and affordable." The ordinance penalizes only conduct in Santa Monica, regardless of whether the visitors are in-state or out-of-state. Accordingly, we conclude that the complaint does not sufficiently allege that the vacation-rental ban itself is a direct regulation of interstate commerce.

### b. Booking and payment transactions

The ordinance makes it illegal to "undertake, maintain, authorize, aid, facilitate or advertise any vacation rental activity." Santa Monica Mun. Code § 6.20.030. Rosenblatt argues that the ordinance violates the dormant Commerce Clause by directly regulating booking and payment transactions that may occur entirely out-of-state. Rosenblatt's argument relies primarily on the plurality opinion in *Edgar v. MITE Corp.*, 457 U.S. 624 (1982), and our decision in *Valley Bank of Nevada v. Plus System, Inc.*, 914 F.2d 1186 (9th Cir. 1990).

In *MITE*, the state law directly regulated interstate communications by preventing interstate tender offers unless certain requirements were met. 457 U.S. at 640. The Supreme Court held that this "direct regulation" surpassed the "incidental regulation" of interstate commerce permitted under the dormant Commerce Clause. *Id.* The *MITE* plurality did not opine, as Rosenblatt asserts, that "state and local laws purporting to regulate transactions and/or commercial offers that occur 'across state lines' constitute 'a direct restraint on interstate commerce.'" Appellant's Opening Br. at 30 (quoting *MITE*, 457 U.S. at 641–42). The plurality instead held that the particular state statute at issue was "a direct restraint on interstate commerce" because it regulated conduct that "would not affect a single [in-state] shareholder" and had "a sweeping extraterritorial effect." *Id.* at 642. A state or local law that regulates transactions with an interstate component is not in itself problematic; the law becomes problematic when it directly regulates the interstate component of the transaction.

*Valley Bank*, in contrast, held that a state law regulating in-state ATM transactions did not violate the Commerce Clause even though it directly affected the workings of an interstate ATM network. 914 F.2d at 1190–93. There, we rejected the ATM network's argument that the law directly regulated interstate commerce just because uniformity among ATMs in different states was important to the network's efficient operation. *Id.* We stressed that "the commerce clause does not exist to protect a business's right to do business according to whatever rules it wants," which is especially true in industries where uniformity is not a necessity. *Id.* at 1192. We also noted that a state's law "is not 'discriminatory' under the commerce clause simply because it applies most often to out-of-staters." *Id.* We

concluded that a law "that applies evenhandedly certainly passes muster under the commerce clause." *Id.* at 1193.

As discussed above, the ordinance here applies evenhandedly. Unlike *MITE*, the ordinance does not directly restrain interstate commerce although it may regulate transactions with an interstate component. Because every out-of-state booking and payment that the ordinance regulates necessarily concerns property within Santa Monica, we cannot characterize these transactions as activities that are separate and entirely out-of-state. They are better categorized as part of a contractual relationship that Santa Monica properly regulates under its police power. Further, uniformity is not necessary to the vacation rental market. Even if numerous municipalities nationwide adopted ordinances like Santa Monica's, the national market for vacation rental bookings and payments would not be stifled. *See Valley Bank*, 914 F.2d at 1191–93; *see also Exxon Corp. v. Governor of Maryland*, 437 U.S. 117, 128 (1978) (stating that the Court "has only rarely held that the Commerce Clause itself pre-empts an entire field from state regulation, and then only when a lack of national uniformity would impede the flow of interstate goods").

### c. Advertising

Rosenblatt also contends the ordinance "purports to ban wholly extraterritorial communications and advertisements made over the Internet and in other jurisdictions" by preventing the advertisement of Santa Monica vacation rentals. The argument concerns section 6.20.030 of the ordinance:

> No *person*, including any Hosting Platform operator, shall undertake, maintain, authorize, aid, facilitate or *advertise* any

> Home-Sharing activity that does not comply
> with Section 6.20.020 of this Code or any
> Vacation Rental activity.

Santa Monica Mun. Code § 6.20.030(a) (2015) (emphasis added).  Rosenblatt contends that the ordinance's reference to 'person' deprives any person—within or outside of Santa Monica and regardless of whether she actually intends to rent out her property—of her right to advertise a Santa Monica vacation rental.

Santa Monica offers a different interpretation.[3]    It contends that canons of construction compel us to construe section 6.20.030 narrowly as applying only within the city's territorial limits.  Federal courts "must accept a narrowing construction to uphold the constitutionality of an ordinance if its language is 'readily susceptible' to it."  *Nunez ex rel.*

---

[3] At oral argument, Santa Monica's counsel argued that section 6.20.030's use of 'person' is limited by the second half of that sentence, which requires any advertising to comply with section 6.20.020's requirements for hosts who engage in home sharing.  But "person" applies to one who advertises *either* "any Home-Sharing activity that does not comply with Section 6.20.020" *or* "any Vacation Rental activity."  Underscoring this point, in 2017 Santa Monica reversed the order of these two independent clauses: "No host shall undertake, maintain, authorize, aid, facilitate or advertise any vacation rental activity or any home-sharing activity that does not comply with Section 6.20.020 . . . ."  Santa Monica Mun. Code § 6.20.030 (2017).  A host "includes any person who offers, facilitates, or provides services to facilitate, a vacation rental or home-share, including but not limited to insurance, concierge services, catering, restaurant bookings, tours, guide services, entertainment, cleaning, property management, or maintenance of the residential property or unit."  *Id.* § 6.20.010(b).  Rosenblatt confirmed at oral argument that her challenge was specific to the 2015 version of the ordinance, not the 2017 version.

*Nunez v. City of San Diego*, 114 F.3d 935, 942 (9th Cir. 1997) (quoting *Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 397 (1988)).  A California municipality "may not exercise its governmental functions beyond its . . . boundaries," *S.D. Myers, Inc.*, 253 F.3d at 473 (quoting *City of Oakland v. Brock*, 67 P.2d 344, 345 (Cal. 1937)) (emphasis omitted), and courts "presum[e] that the legislative body intended not to violate the constitution" when enacting ordinances, *City of Los Angeles v. Belridge Oil Co.*, 271 P.2d 5, 11 (Cal. 1954).  Courts interpreting a municipal ordinance therefore "presum[e] that the governing body of the city was legislating with reference to the conduct of business within the territorial limits of the city."  *Id.* (quoting *City of Sedalia ex rel. Ferguson v. Shell Petroleum Corp.*, 81 F.2d 193, 196–97 (8th Cir. 1936)).  Because nothing in the ordinance here suggests that it was intended to have extraterritorial application,**[4]** we reject Rosenblatt's broader construction of the ordinance's advertising ban.

### 2.   The   ordinance   does   not discriminate against interstate commerce

We next consider Rosenblatt's arguments that the ordinance is a per se violation of the dormant Commerce Clause because it favors in-state over out-of-state interests.

The party challenging legislation on dormant Commerce Clause grounds bears the initial burden of showing discrimination. *Int'l Franchise Ass'n v. City of Seattle*, 803 F.3d 389, 400 (9th Cir. 2015).  The most common form of

---

**[4]** Even if the ordinance could be construed broadly to apply to a non-resident's vacation rental advertising occurring wholly outside of the city, Rosenblatt, as a Santa Monica resident, lacks standing to challenge Santa Monica's direct regulation of such a transaction.  *See Sierra Med. Servs. All. v. Kent*, 883 F.3d 1216, 1227 (9th Cir. 2018).

discrimination against interstate commerce is disparate impact: the "differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." *Or. Waste Sys., Inc.*, 511 U.S. at 99. The Supreme Court has also found discrimination when a law imposes costs on out-of-staters that in-state residents would not have to bear. *See, e.g.*, *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 350–51 (1977) (finding a state law discriminatory partially because of the costs imposed on out-of-state producers as compared to in-state producers).

Further, "local regulations that treat out-of-staters in a disparate manner will be treated as discriminatory even though they also discriminate against those in other parts of that state." Erwin Chemerinsky, *Constitutional Law: Principles and Policies*, § 5.3.4, at 475 (6th ed. 2019). In *Dean Milk Co. v. City of Madison*, 340 U.S. 349 (1951), the Court considered an ordinance that required all milk sold in a city to be pasteurized within five miles of the city. *See id.* at 351–52. The ordinance effectively prevented the sale of milk pasteurized in other states, as well as milk pasteurized in most other parts of the state. *See id.* at 352. The Court concluded that the ordinance violated the dormant Commerce Clause because it "erect[ed] an economic barrier protecting a major local industry against competition from without the state." *Id.* at 354. In a footnote, the Court stressed the irrelevance of the fact that the law also discriminated against in-state sellers: "It is immaterial that Wisconsin milk from outside the Madison area is subjected to the same proscription as that moving in interstate commerce." *Id.* at 354 n.4.

Similarly, in *Fort Gratiot Sanitary Landfill, Inc. v. Michigan Department of Natural Resources*, the Supreme Court held that a state law was discriminatory when it

limited the ability of a county to accept waste for disposal from other counties or other states.  504 U.S. 353 (1992). Again, the Court recognized that discrimination against other counties does not change the analysis because "a state (or one of its political subdivisions) may not avoid the strictures of the Commerce Clause by curtailing the movement of articles of commerce through subdivisions of the State, rather than through the State itself."  *Id.* at 361.

Nevertheless, the Supreme Court has been careful to distinguish discrimination through purpose or effect—which may violate the dormant Commerce Clause—from the non-discriminatory, incidental effects of a law.  In *Exxon Corp. v. Governor of Maryland*, 437 U.S. 117 (1978), the Court examined a state law that prohibited petroleum producers and refiners from operating gas stations in the state.  All of the petroleum products sold in the state were produced and refined out-of-state; the effect of the law was to prevent all oil companies from owning in-state gas stations, benefiting local business.  *Id.* at 127–28.  The Court still concluded that the law was not discriminatory:

> [T]he Act creates no barriers whatsoever against interstate independent dealers; it does not prohibit the flow of interstate goods, place added costs upon them, or distinguish between in-state and out-of-state companies in the retail market.  The absence of any of these factors fully distinguishes this case from those in which a State has been found to have discriminated against interstate commerce.

*Id.* at 126.

We now address each of Rosenblatt's specific arguments that the ordinance discriminates against out-of-state interests.

### a.  Access to residential neighborhoods

First, Rosenblatt argues that Santa Monica is attempting to "preclud[e] out-of-state travelers from accessing [residential] neighborhoods."  Given the availability of reasonable alternatives to vacation rentals, the ordinance does not preclude anyone from accessing city neighborhoods.  And, insofar as the ordinance might favor owners by allowing them to live in residential neighborhoods, it does not discriminate against persons outside of Santa Monica, who stand on equal footing with Santa Monica residents in their ability to purchase Santa Monica property and reside there.

Rosenblatt relies heavily on *City of Philadelphia v. New Jersey*, 437 U.S. 617 (1978), which involved a state law that was facially discriminatory: It "prohibit[ed] the importation of most solid or liquid waste which originated or was collected outside the territorial limits" of the state. *Id.* at 618 (internal quotation mark omitted).  The Supreme Court explained that the state would have been free to ban the flow of waste into its landfills altogether, even if such a measure affected interstate commerce. *See id.* at 625–26.  The Court held that the state statute, however, violated the dormant Commerce Clause because it "discriminat[ed] against articles of commerce coming from outside the State," as opposed to all waste. *Id.* at 626–27.  It made no difference whether the state's intent was environmental conservation or economic protectionism because the state provided no reason, "apart from their origin, to treat them differently." *Id*. at 627.

Here, Santa Monica's ban on vacation rentals applies in the same manner to persons nationwide, including Santa Monica residents who may be interested in renting a vacation home from another resident. "Thus, it 'visits its effects equally upon both interstate and local business.'" *CTS Corp. v. Dynamics Corp. of Am.*, 481 U.S. 69, 87 (1987) (quoting *Lewis v. BT Inv. Managers, Inc*., 447 U.S. 27, 36 (1980)); *see also Pharm. Research & Mfrs. of Am. v. County of Alameda*, 768 F.3d 1037, 1042 (9th Cir. 2014) (holding that local ordinance did not directly discriminate against interstate commerce because it "applies to all manufacturers that make their drugs available in Alameda County— without respect to the geographic location of the manufacturer"); *Ass'n des Éleveurs de Canards et d'Oies du Québec*, 729 F.3d at 949 (holding that California statute banning the sale of products from force-fed fowl was not directly discriminatory because it "applies to both California entities and out-of-state entities . . . regardless of where the force feeding occurred").

### b. Support of local hotels and the cost of travel lodging

Rosenblatt argues that Santa Monica's purported support of hotels discriminates against interstate commerce by favoring local interests over out-of-state interests. She further contends that by limiting competition for the City's local hotels, the ordinance "increase[s] the City's [occupancy tax] revenues at the expense of out-of-state travelers, who must incur increased costs for travel lodging in the City."

First, the ordinance applies equally to renters and property-owners from outside California, California residents outside of Santa Monica, and Santa Monica residents themselves. By claiming otherwise, Rosenblatt

asserts that the hotels represent local interests (because of the tax revenue) and the vacation rental industry represents out-of-state interests.  As the district court correctly reasoned:

> This argument is illogical.  A hotel in Santa Monica can be owned by an in-state or out-of-state person or entity, just as would-be vacation rentals can.  Similarly, Californians may wish to rent a hotel room or vacation rental in Santa Monica.  The Ordinance treats all of these interests equally; there is only one set of rules, and it applies to all regardless of the origin of the interest.

Like the hotel industry, the vacation rental industry represents both local and out-of-state interests.  Moreover, the ordinance applies equally to Santa Monica residents who wish to rent a hotel room or vacation rental.

Second, the complaint does not adequately allege that the ordinance increases the relative market share of local businesses.  *See Exxon Corp.*, 437 U.S. at 126 & n.16 (explaining that local regulations that affect interstate commerce do not discriminate, even if they disproportionately affect out-of-state businesses, if they do not increase the relative market share of local businesses). Nor does the complaint plausibly allege a net negative effect on commerce outside of California.  *See Nat'l Paint & Coatings Ass'n v. City of Chicago*, 45 F.3d 1124, 1132 (7th Cir. 1995) ("To determine whether there is a disparate effect on interstate commerce . . . , we need to know what consumers will replace [Santa Monica vacation rentals] with.").

### c. The lack of a residency requirement

Lastly, Rosenblatt argues that the ordinance discriminates against interstate commerce because it "contains an unconstitutional residency requirement allowing only Santa Monica residents to engage in short-term rentals." By "residency requirement," Rosenblatt refers to the ordinance's exception for home sharing, which allows short term rentals if "at least one of the dwelling unit's primary residents lives on-site, in the dwelling unit, throughout the visitors' stay." Santa Monica Mun. Code § 6.20.010(a).

Contrary to Rosenblatt's characterization, the ordinance does not require the primary resident in the dwelling to be the owner of the dwelling. Moreover, Rosenblatt does not explain how the ordinance would prevent an out-of-state homeowner who owns property in Santa Monica from being able to extract economic value from the property. For example, the out-of-state owner could rent out the property on a long-term basis with a condition that one of the rooms be used for the owner's short-term rentals. Or the owner could expressly allow the long-term renter to sublet a room on a short-term basis in exchange for paying a higher monthly rent. The ordinance also applies equally to owners who reside in Santa Monica, or elsewhere in California, but at a property separate from their rental property. Accordingly, the complaint fails to plausibly allege that the home-sharing exception obviously advantages Santa Monica residents at the expense of out-of-state homeowners.[5]

---

[5] Rosenblatt asserts that "a residency licensing requirement cannot be saved on grounds that the statutory framework allows an out-of-stater to undertake additional steps . . . to *indirectly* obtain a license when an

Rosenblatt's argument draws a false equivalence between in- and out-of-state property owners with respect to home sharing. A "fundamental element of dormant Commerce Clause jurisprudence" is "the principle that 'any notion of discrimination assumes a comparison of substantially similar entities.'" *Dep't of Revenue v. Davis*, 553 U.S. 328, 342 (2008) (quoting *United Haulers Ass'n, Inc. v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 550 U.S. 330, 342 (2007)). Santa Monica's ordinance does not prohibit out-of-state property owners from home sharing in their out-of-state homes, nor does it prohibit them from allowing home sharing in their Santa Monica properties. While non-resident property owners cannot personally serve as the primary resident whose presence is required during the home share, that is because they are not similarly situated to the Santa Monica residents who can.

Thus, the complaint does not plausibly allege that the ordinance directly regulates or burdens interstate commerce.

---

in-state business can obtain the license *directly*." But the cases she cites are inapposite because they involve substantially greater burdens and costs on out-of-state residents. In *Granholm v. Heald*, the Supreme Court struck down state laws that allowed in-state wineries to ship directly to consumers while requiring out-of-state wineries to establish or pay for distribution networks in the state, which increased costs, sometimes prohibitively. 544 U.S. 460, 473–75 (2005). In *Nationwide Biweekly Administration, Inc. v. Owen*, we struck down a state law that required an out-of-state company to incorporate in California in order to conduct business by mail with California residents. 873 F.3d 716, 736–37 (9th Cir. 2017). Here, the ordinance does not "require an out-of-state firm 'to become a resident in order to compete on equal terms.'" *Id.* at 736 (quoting *Heald*, 544 U.S. at 475).

### C. The complaint does not plausibly allege that the ordinance unduly burdens interstate commerce through its incidental effects

Although the ordinance does not directly regulate or burden interstate commerce, it does, as Santa Monica concedes, implicate interstate commerce through its incidental effects.  If an ordinance regulates evenhandedly with only incidental effects on interstate commerce, then the second step of the dormant Commerce Clause analysis—the *Pike* test—applies.  *See Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970).  We will uphold an ordinance under *Pike* if it "effectuate[s] a legitimate local public interest" "unless the burden imposed on [interstate] commerce is *clearly excessive* in relation to the putative local benefits."  *Id.* at 142 (emphasis added).

Rosenblatt contends the district court erred in applying the *Pike* test at the motion to dismiss stage because determining the excessive nature of the burden is a factual question more appropriate for summary judgment. Rosenblatt's suggestion that issues involving the *Pike* test cannot be resolved at the 12(b)(6) stage is incorrect.

"[T]he party challenging the regulation . . . must establish that the burdens that the regulation imposes on interstate commerce clearly outweigh the local benefits arising from it."  *Kleenwell Biohazard Waste & Gen. Ecology Consultants, Inc. v. Nelson*, 48 F.3d 391, 399 (9th Cir. 1995).  As our sister circuit explained:

> *Pike* balancing is required *only* if the challenged law has a discriminatory effect on interstate commerce.  And conclusory allegations of disparate impact are not sufficient; to survive the City's motion to

> dismiss, the plaintiffs needed to plead specific facts to support a plausible claim that the ordinance has a discriminatory effect on interstate commerce.

*Park Pet Shop, Inc. v. City of Chicago*, 872 F.3d 495, 503 (7th Cir. 2017); *see also N.Y. Pet Welfare Ass'n v. City of New York*, 850 F.3d 79, 91 (2d Cir. 2017) (holding that the plaintiff "fail[ed] sufficiently to allege that the burden of selling directly to City pet shops, rather than through distributors, will fall disproportionately on out-of-state breeders").

We reject Rosenblatt's contention that her complaint survives scrutiny as long as she alleges "*any* burdens on interstate commerce" and does not allege a basis for a court to conclude "that the [o]rdinance *actually* serves legitimate state interests." Her argument misstates the *Pike* test. Even if the complaint alleges facts showing that the local benefits claimed by the city are all illusory or illegitimate, it must also plausibly allege the ordinance places a "significant" burden on interstate commerce. Courts may not assess the benefits of a state law or the wisdom in adopting it unless the law "either discriminates in favor of in-state commerce or imposes a 'significant burden on interstate commerce.'" *Chinatown Neighborhood Ass'n*, 794 F.3d at 1146 (quoting *Nat'l Ass'n of Optometrists*, 682 F.3d at 1156). And, contrary to Rosenblatt's contention, we presume the law serves the city's legitimate interests; it is Rosenblatt's burden to plausibly allege otherwise. *See Spoklie v. Montana*, 411 F.3d 1051, 1059 (9th Cir. 2005). Rosenblatt's complaint fails to sufficiently allege that the ordinance's effect on interstate commerce clearly outweighs the ordinance's local benefits.

As we previously recognized, "[o]nly a small number of . . . cases invalidating laws under the dormant Commerce Clause have involved laws that were genuinely nondiscriminatory" but still imposed a clearly excessive burden on interstate commerce. *Chinatown Neighborhood Ass'n*, 794 F.3d at 1146 (omission in original) (quoting *Nat'l Ass'n of Optometrists*, 682 F.3d at 1150). "These cases address state 'regulation of activities that are inherently national or require a uniform system of regulation'—most typically, interstate transportation." *Id.* (internal citation omitted) (quoting *Nat'l Ass'n of Optometrists*, 682 F.3d at 1148).

The complaint does not allege that Santa Monica's ordinance interferes with activity that is inherently national or requires a uniform system of regulation. Land use regulations are inherently local. They are not a significant burden on interstate commerce merely because they disappoint would-be visitors from out of state. *See Spoklie*, 411 F.3d at 1059 ("That a particular service or recreation appeals to out-of-staters . . . does not impose on states an obligation to permit it.").

Rosenblatt argues that vacation rentals constitute a $100 billion industry and that Santa Monica's ordinance substantially impairs that industry. But Rosenblatt's complaint itself belies that argument. The complaint alleges that the "direct result of the online marketplace" for vacation rentals is "increased competition" for hotel revenue. The complaint then relies on an unspecified report to allege that "81.5% of Airbnb's bookings are shifted from away from hotels to Airbnb." The complaint does not support Rosenblatt's argument that the ordinance impairs the national vacation-rental industry; to the contrary, the complaint effectively recognizes that the ordinance likely

diverts Santa Monica's tourism dollars from vacation rentals to hotels. And the Supreme Court has held that "interstate commerce is not subjected to an impermissible burden simply because an otherwise valid regulation causes some business to shift from one interstate supplier to another." *Exxon*, 437 U.S. at 127 (rejecting "notion that the Commerce Clause protects the particular structure or methods of operation in a retail market"); *see Yakima Valley Mem'l Hosp. v. Wash. State Dep't of Health*, 731 F.3d 843, 847 (9th Cir. 2013) ("What is really at issue is the shifting of business from one competitor to another, not a burden on interstate commerce.").

In construing inferences in Rosenblatt's favor, we read the complaint to allege that some of Santa Monica's tourism business may have been lost altogether because of the ordinance. Rosenblatt alleges that "hotel prices in Santa Monica have increased," which "has resulted in a decrease in tourism and a decrease in transient lodging use in the City." But the complaint fails to allege the magnitude of this decrease, which we require. *See S.D. Myers, Inc.*, 253 F.3d at 471 ("While we do not require a dollar estimate of the effect the Ordinance will have, we do require specific details as to how the costs of the Ordinance burdened interstate commerce.").[6] And the complaint provides no rebuttal to the plausible explanation that hotels may have recaptured much of the 81.5% of vacation rental bookings that allegedly had shifted to vacation rentals. The complaint does not plausibly allege how any lost fraction of the vacation-rental business

---

[6] The complaint's only specific allegation is that Santa Monica "saw a 2% decrease in the number of jobs supported by tourism" after "a steady increase of approximately 6% for the preceding three years." The complaint does not explain any correlation between the loss of jobs and the passage of the ordinance.

significantly burdens commerce—let alone interstate commerce. *See Yakima Valley Mem'l Hosp.*, 731 F.3d at 848 (concluding that 25% decrease in medical procedure's performance in the region after local regulations caused hospital to lose its business to pricier hospital "[did] not place a significant burden on interstate commerce").

Because Rosenblatt fails to show a high burden on interstate commerce—and, at most, suggests some negligible burden on the local economy of Santa Monica, the complaint cannot meet the standard established in *Pike*. Thus, the complaint's allegations do not adequately demonstrate how the alleged burden on interstate commerce would clearly exceed the stated benefits of the ordinance.

## III. CONCLUSION

Rosenblatt fails to plausibly allege that Santa Monica's ordinance directly or indirectly discriminated against or burdened interstate commerce. Accordingly, we affirm the district court's dismissal of those claims.

**AFFIRMED**.

Appendix A

ORDINANCE NUMBER 2484 (CCS)

(City Council Series)

AN ORDINANCE OF THE CITY COUNCIL OF THE CITY OF
SANTA MONICA ADDING CHAPTER 6.20 TO THE SANTA MONICA
MUNICIPAL CODE CLARIFYING PROHIBITIONS AGAINST VACATION RENTALS
AND IMPOSING REGULATIONS ON HOME SHARING

WHEREAS, the City consists of just eight square miles of coastal land which is home to 90,000 residents, the job site of 300,000 workers, and a destination for as many as 500,000 visitors on weekends and holidays; and

WHEREAS, Santa Monica's primary housing goals include preserving its housing stock and preserving the quality and character of its existing single and multi-family residential neighborhoods.  Santa Monica's prosperity has always been fueled by the area's many attractive features including its cohesive and active residential neighborhoods and the diverse population which resides therein.  In order to continue to flourish, the City must preserve its available housing stock and the character and charm which result, in part, from cultural, ethnic, and economic diversity of its resident population; and

WHEREAS, the City must also preserve its unique sense of community which derives, in large part, from residents' active participation in civic affairs, including local government, cultural events, and educational endeavors; and

WHEREAS, Santa Monica's natural beauty, its charming residential communities, its vibrant commercial quarters and its world class visitor serving amenities have drawn visitors from around the United States and around the world; and

WHEREAS, the City affords a diverse array of visitor-serving short term rentals, including, hotels, motels, bed and breakfasts, vacation rentals and home sharing, not all of which are currently authorized by local law; and

WHEREAS, operations of vacation rentals, where residents rent-out entire units to visitors and are not present during the visitors' stays are detrimental to the community's welfare and are prohibited by local law, because occupants of such vacation rentals, when not hosted, do not have any connections to the Santa Monica community and to the residential neighborhoods in which they are visiting; and

WHEREAS, the presence of such visitors within the City's residential neighborhoods can sometimes disrupt the quietude and residential character of the neighborhoods and adversely impact the community; and

WHEREAS, judicial decisions have upheld local governments' authority to prohibit vacation rentals; and

WHEREAS, with the recent advent of the so called "sharing economy," there is growing acceptance of the longstanding practice of "home-sharing," whereby residents host visitors in their homes for short periods of stay, for compensation, while the resident host remains present throughout the visitors' stay; and

WHEREAS, long before the advent of the sharing economy, home-sharing activities were already commonly undertaken throughout Santa Monica and throughout the United States; and

WHEREAS, history has shown that home-sharing activities spread the good-will of Santa Monica worldwide and have enhanced Santa Monica's image throughout the world; and

WHEREAS, home-sharing does not create the same adverse impacts as unsupervised vacation rentals because, among other things, the resident hosts are present to introduce their guests to the City's neighborhoods and regulate their guests' behavior; and

WHEREAS, history has shown that home-sharing activities are relatively very small in number, when compared to the number of persons utilizing vacation rentals or the City's hotels and motels; and

WHEREAS, while the City recognizes that home-sharing activities can be conducted in harmony with surrounding uses, those activities must be regulated to ensure that the small number of home-sharers stay in safe structures and do not threaten or harm the public health or welfare; and

WHEREAS, any monetary compensation paid to the resident hosts for their hospitality and hosting efforts rightfully belong to such hosts and existing law authorizes the City to collect Transient Occupancy Taxes ("TOTs") for vacation rentals and home-sharing activities; and

WHEREAS, existing law obligates both the hosts and rental agencies or hosting platforms to collect and remit TOTs to the City.

NOW, THEREFORE, THE CITY COUNCIL OF THE CITY OF SANTA MONICA DOES HEREBY ORDAIN AS FOLLOWS:

SECTION 1.  Chapter 6.20 of the Santa Monica Municipal Code is hereby added to read as follows:

**Chapter 6.20 HOME SHARING AND VACATION RENTALS**

**6.20.010     Definitions**

For purposes of this Chapter, the following words or phrases shall have the following meanings:

(a)     Home-Sharing.  An activity whereby the residents host visitors in their homes, for compensation, for periods of 30 consecutive days or less, while at least one of the dwelling unit's primary residents lives on-site, in the dwelling unit, throughout the visitors' stay.

(b)     Hosting Platform.  A marketplace in whatever form or format which facilitates the Home-Sharing or Vacation Rental, through advertising, match-making or any other means, using any medium of facilitation, and from which the operator of the hosting platform derives revenues, including booking fees or advertising revenues, from providing or maintaining the marketplace.

(c)     Vacation Rental.  Rental of any dwelling unit, in whole or in part, within the City of Santa Monica, to any person(s) for exclusive transient use of 30 consecutive days or less, whereby the unit is only approved for permanent residential occupancy and not approved for transient occupancy or Home-Sharing as authorized by this

Chapter.  Rental of units within City approved hotels, motels and bed and breakfasts shall not be considered Vacation Rental.

### 6.20.020    Home-Sharing Authorization

(a)    Notwithstanding any provision of this Code to the contrary, Home-Sharing shall be authorized in the City, provided that the Home-Sharing host complies with each of the following requirements:

(1)    Obtains and maintains at all times a City Business License authorizing Home-Sharing activity.

(2)    Operates the Home-Sharing activity in compliance with all Business License permit conditions, which may be imposed by the City to effectuate the purpose of this Chapter.

(3)    Collects and remits Transient Occupancy Tax ("TOT"), in coordination with any Hosting Platform if utilized, to the City and complies with all City TOT requirements as set forth in Chapter 6.68 of this Code.

(4)    Takes responsibility for and actively prevents any nuisance activities that may take place as a result of Home-Sharing activities.

(5)    Complies with all applicable laws, including all health, safety, building, fire protection, and rent control laws.

(6)    Complies with the regulations promulgated pursuant to this Chapter.

(b)    If any provision of this Chapter conflicts with any provision of the Zoning Ordinance codified in Article IX of this Code, the terms of this Chapter shall prevail.

### 6.20.030     Prohibitions

(a)     No person, including any Hosting Platform operator, shall undertake, maintain, authorize, aid, facilitate or advertise any Home-Sharing activity that does not comply with Section 6.20.020 of this Code or any Vacation Rental activity.

### 6.20.050     Hosting Platform Responsibilities

The operator / owner of any Hosting Platform shall:

(a)     be responsible for collecting all applicable TOTs and remitting the same to the City.  The Hosting Platform shall be considered an agent of the host for purposes of TOT collections and remittance responsibilities as set forth in Chapter 6.68 of this Code.

(b)     disclose to the City on a regular basis each Home Sharing and Vacation Rental listing located in the City, the names of the persons responsible for each such listing, the address of each such listing, the length of stay for each such listing and the price paid for each stay.

### 6.20.080     Regulations

The City Manager or his or her designee may promulgate regulations, which may include but are not limited to permit conditions, reporting requirements, inspection frequencies, enforcement procedures, advertising restrictions, disclosure requirements, or insurance requirements, to implement the provisions of this Chapter.  No person shall fail to comply with any such regulation.

### 6.20.090     Fees

The City Council may establish and set by Resolution all fees and charges as may be necessary to effectuate the purpose of this Chapter.

### 6.20.100    Enforcement.

(a)    Any person violating any provision of this Chapter shall be guilty of an infraction, which shall be punishable by a fine not exceeding two hundred fifty dollars, or a misdemeanor, which shall be punishable by a fine not exceeding five hundred dollars, or by imprisonment in the County Jail for a period not exceeding six months or by both such fine and imprisonment.

(b)    Any person convicted of violating any provision of this Chapter in a criminal case or found to be in violation of this Chapter in a civil case brought by a law enforcement agency shall be ordered to reimburse the City and other participating law enforcement agencies their full investigative costs, pay all back TOTs, and remit all illegally obtained rental revenue to the City so that it may be returned to the Home-Sharing visitors or used to compensate victims of illegal short term rental activities.

(c)    Any person who violates any provision of this Chapter shall be subject to administrative fines and administrative penalties pursuant to Chapter 1.09 and Chapter 1.10 of this Code.

(d)    Any interested person may seek an injunction or other relief to prevent or remedy violations of this Chapter.  The prevailing party in such an action shall be entitled to recover reasonable costs and attorney's fees.

(e)    The remedies provided in this Section are not exclusive, and nothing in this Section shall preclude the use or application of any other remedies, penalties or procedures established by law.

SECTION 2.  Any provision of the Santa Monica Municipal Code or appendices thereto inconsistent with the provisions of this Ordinance, to the extent of such inconsistencies and no further, is hereby repealed or modified to that extent necessary to effect the provisions of this Ordinance.

SECTION 3.  If any section, subsection, sentence, clause, or phrase of this Ordinance is for any reason held to be invalid or unconstitutional by a decision of any court of competent jurisdiction, such decision shall not affect the validity of the remaining portions of this Ordinance.  The City Council hereby declares that it would have passed this Ordinance and each and every section, subsection, sentence, clause, or phrase not declared invalid or unconstitutional without regard to whether any portion of the ordinance would be subsequently declared invalid or unconstitutional.

SECTION 4.  The Mayor shall sign and the City Clerk shall attest to the passage of this Ordinance.  The City Clerk shall cause the same to be published once in the official newspaper within 15 days after its adoption.  This Ordinance shall become effective 30 days from its adoption.