# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

August 22, 2022

Lyle W. Cayce
Clerk

No. 21-30643

Samantha Hignell-Stark; White Spider Rental
Concierge, L.L.C.; Garett Majoue; Russell Frank;
Samantha McRaney; Bob McRaney; Jimmie Taylor,

*Plaintiffs—Appellants/Cross-Appellees*,

*versus*

The City of New Orleans,

*Defendant—Appellee/Cross-Appellant*.

Appeal from the United States District Court
for the Eastern District of Louisiana
No. 2:19-CV-13773

Before Smith, Wiener, and Southwick, *Circuit Judges*.
Jerry E. Smith, *Circuit Judge*:

This case involves three constitutional challenges to New Orleans's regulation of short-term rentals ("STRs")—the City's term for the type of lodging offered on platforms such as Airbnb and Vrbo. The district court granted summary judgment to the City on two of those challenges but held that the third was "viable." Both sides appealed. We affirm in part, vacate in part, and dismiss the City's cross-appeal for lack of jurisdiction.

No. 21-30643

I.

A.

Before STRs became a major phenomenon, the City forbade property owners in residential neighborhoods from renting their homes for less than thirty days. In 2016, however, the City decided to offer licenses for such property owners to do so for shorter periods. That licensing regime went into effect on April 1, 2017.

That initial regime made clear that an STR license was "a privilege, not a right."[1] It provided only that the City "*may* issue" an STR license—even to someone who met all the statutory requirements for one. *Id.* § 26-615 (emphasis added). STR licenses also expired after one year. *Id.* §§ 26-613(a), 26-616. And while the City promised that "[r]enewal permits shall be issued in the same manner as initial permits," *id.* § 26-616, that assurance was made subject to its limitations on issuing permits in the first place.

One year into the initial regime, the City commissioned a study from its Planning Commission to reevaluate the STR policies. The study found that the rapid proliferation of STRs had brought nuisances to the City. Specifically, it discovered that STRs in residential neighborhoods had lowered residents' quality of life. Many visitors to the City who stayed in STRs were loud and did not clean up after themselves. The study also determined that the expansion of STRs into residential neighborhoods had led to a "loss of neighborhood character." And it collected "anecdotal evidence" that the booming STR market had made housing less affordable for residents.

Because of the study and other efforts to examine the STR market, the

---

[1] CODE OF THE CITY OF NEW ORLEANS, LA. ("OLD CODE") § 26-613(a) (April 28, 2017), https://library.municode.com/la/new_orleans/codes/code_of_ordinances/292015.

No. 21-30643

City substantially revised its STR licensing regime in 2019. Only two of those changes are relevant to this appeal.

*First*, the City imposed a residency requirement for STRs in residential neighborhoods. Its new policy provided that no person could obtain a license to own such an STR unless the property was also "the owner's primary residence."[2] At oral argument, the City explained that it enforces this restriction by requiring applicants to show that they have a homestead exemption for the property they wish to rent.[3] Under Louisiana law, a homeowner may receive a homestead exemption only for his principal residence. *See* La. Const. art. 7, § 20.

*Second*, the City imposed new advertising restrictions on STR license holders. Those restrictions prohibited them from (1) advertising illegal STRs and (2) advertising legal STRs with greater capacities than permitted by their licenses. *See* New Code § 26-618(b)(1)–(4).

## B.

The plaintiffs are a group of property owners who wish to obtain STR licenses for their homes.[4] Many acquired STR licenses under initial regimes that were not renewed, and several were denied STR licenses under the new regime on account of the City's new residency requirement.

In November 2019, the plaintiffs sued the City under 42 U.S.C. § 1983

---

[2] Code of the City of New Orleans, La. ("New Code") § 26-617(c)(6)(v)                                                                (2022), https://library.municode.com/la/new_orleans/codes/code_of_ordinances.

[3] Oral Argument at 26:39–27:21; New Code § 26-617(c)(6)(v); New Orleans Comprehensive Zoning Ordinance ("CZO") § 20.3.LLL.3(h) (2022), https://czo.nola.gov/home.

[4] The sole exception is White Spider, which "provid[es] services to [STR] owners in connection with [renting] their houses and apartments."

for violating a litany of their constitutional rights. Three of their claims are relevant here. *First*, they said the City's failure to renew their STR licenses violated the Takings Clause because they had a property interest in the renewal of their licenses. *Second*, they maintained the residency requirement violated the dormant Commerce Clause because it discriminated against interstate commerce. *Third*, they contended that the advertising restrictions violated the First Amendment as a prior restraint on their protected speech. For remedies, the plaintiffs requested a declaration that the City's policies were unconstitutional and a permanent injunction against their enforcement. They also asked for attorneys' fees under 42 U.S.C. § 1988.

The plaintiffs moved for summary judgment on their Takings Clause claim. The City cross-moved for summary judgment on that claim plus the dormant Commerce Clause claim. The district court granted the City's motion in full. It held that the plaintiffs' Takings Clause claim failed because they had no property interest in the renewal of their licenses. It also rejected their dormant Commerce Clause challenge. Although it acknowledged that the residency requirement discriminated against interstate commerce, it held that the policy was constitutional because the burden it imposed was not "clearly excessive in relation to the putative local benefits." *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970)

The district court then instructed the parties to brief the plaintiffs' prior-restraint claim. Based on that briefing, it held that the prior-restraint claim was "viable." The court reasoned that the ordinances gave the City too much discretion in approving and denying STRs—and therefore, the plaintiffs' ability to advertise STRs.

The plaintiffs appeal the summary judgment on the dormant Commerce Clause claim and the Takings Clause claim. The City cross-appeals the "holding"—its term, not ours—that the prior-restraint claim is "viable."

## II.

The plaintiffs claim that the City violated the Takings Clause by refusing to renew their STR licenses. In their telling, they enjoyed property interests in the renewal of their licenses that the City took away from them without just compensation. We disagree. The district court correctly held that the plaintiffs have no such interests.[5]

The Takings Clause protects property interests but does not create them. Instead, "the existence of a property interest is determined by reference to existing rules or understandings that stem from an independent source such as state law." *Phillips v. Wash. Legal Found.*, 524 U.S. 156, 164 (1998) (quotation omitted). Accordingly, we usually treat, as dispositive, the existence—or absence—of a property interest under state law.[6]

The plaintiffs, however, do not claim that Louisiana law recognizes that they have a property interest in the renewal of their licenses. They maintain that they have such an interest because this court has recognized that business licenses qualify as property for purposes of procedural due process. They rely on *Bowlby v. City of Aberdeen*, 681 F.3d 215 (5th Cir. 2012). There, we held that "[p]rivileges, licenses, certificates, and franchises qualify as property interests for purposes of procedural due process." *Id.* at 220 (alteration adopted) (quoting *Wells Fargo Armored Serv. Corp. v. Ga. Pub. Serv. Comm'n*, 547 F.2d 938, 941 (5th Cir. 1977)).

---

[5] In addition, we dismiss White Spider at the outset for lack of standing. It does not claim to own property, so it cannot have received an STR license under the initial regime. It thus never had even a purported property interest that was taken by the City.

[6] *See, e.g.*, *Degan v. Bd. of Trs. of Dall. Police & Fire Pension Sys.*, 956 F.3d 813, 815 (5th Cir.), *cert. denied*, 141 S. Ct. 375 (2020); *Van Houten v. City of Fort Worth*, 827 F.3d 530, 539–40 (5th Cir. 2016); *United States v. 0.073 Acres of Land*, 705 F.3d 540, 544 (5th Cir. 2013) (per curiam).

But there's a big difference between saying that something is property for purposes of procedural due process and saying that it is property for purposes of the Takings Clause. The former merely obligates a governmental entity to provide the "owner" with procedural protections—and only when a cost-benefit analysis shows that those procedures are worth the cost. *See generally Mathews v. Eldridge*, 424 U.S. 319 (1976). But the latter means that the government must pay damages. And the test for a property interest protected by procedural due process is quite broad: "A person's interest in a benefit is a 'property' interest for due process purposes if there are such rules or mutually explicit understandings that support his claim of entitlement to the benefit . . . ." *Perry v. Sindermann*, 408 U.S. 593, 601 (1972); *accord Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577–78 (1972).

This court's rule of orderliness, however, requires us to recognize that some "mutually explicit understandings" can create property interests protected by the Takings Clause. The relevant case is *Dennis Melancon, Inc. v. City of New Orleans*, 703 F.3d 262 (5th Cir. 2012). The *Melancon* plaintiffs claimed that an ordinance imposing new restrictions on their taxi licenses enacted a regulatory taking. *Id.* at 266. The ordinance restricted the ability of cab drivers to sell their licenses and declared that those licenses were "privileges and not rights." *Ibid.*

Ultimately, we rejected the *Melancon* plaintiffs' claim that they had a property interest in their licenses for purposes of the Takings Clause. *Id.* at 272–75. But we also indicated that some rights recognized by custom alone could qualify as property for purposes of the Takings Clause. We acknowledged that "state law generally defines what constitutes a property interest," but we maintained that "'unwritten common law' or 'policies and practices' also can rise to the level of creating 'property interests.'" *Id.* at 269 (quoting *Perry*, 408 U.S. at 602–03). We thus concluded that "the Fifth Amendment protects expectations arising not just from legislation or judicial precedent,

but also those springing from custom and practice." *Id.* (alteration adopted and quotation omitted).

Even so, *Melancon* did not hold that customary property rights under the Due Process Clause and Takings Clause are coextensive. Instead, we recognized the opposite. We appeared to acknowledge that the taxi licenses likely qualified as property for purposes of procedural due process under Fifth Circuit precedent. *See id.* at 273 n.7 (citing *Wells Fargo*, 547 F.2d at 941). But we rejected the Takings Clause claims all the same. *Id.* at 272–75. Although *Melancon* cited many procedural-due-process cases[7] in holding that some customary rights can qualify as property under the Takings Clause, the decision is unequivocal: A property interest for purposes of procedural due process does *not* automatically qualify as a property interest protected by the Takings Clause.

With that in mind, we thus clarify *Melancon*'s test for determining whether a customary interest is protected as property by the Takings Clause. Because property interests under the Due Process Clause and the Takings Clause are not the same, that test is not the same as the one for determining whether an interest qualifies as property for procedural due process. Instead, a property interest must be so deeply rooted in custom that "just compensation" for appropriating necessarily includes money damages. U.S. CONST. amend. V. Surmounting that hurdle should be quite difficult. And when we analyze the facts of this case, we have no difficulty in concluding that the plaintiffs had no property interest in the renewal of their STR licenses.

*First*, the original licensing regime was explicit: An STR license is "a

---

[7] *See* 703 F.3d at 269–70 (citing *Roth*, 408 U.S. at 577; *Perry*, 408 U.S. at 602–03; *Conn. Bd. of Pardons v. Dumschat*, 452 U.S. 458, 465 (1981)).

privilege, not a right."[8]  Even an applicant who met the statutory requirements for a license was not entitled to one.[9]  The ordinance also stated that STR licenses "may be revoked or not renewed based on non-compliance with the requirements of the Comprehensive Zoning Ordinance, or the requirements provided" in the ordinance itself.[10]  The plaintiffs thus lacked the sort of ownership in their STR licenses that could support a "legitimate claim of entitlement" to money damages when their licenses were not renewed.  *Melancon*, 703 F.3d at 270 (quoting *Roth*, 408 U.S. at 577).

The plaintiffs object on the ground that the original licensing scheme promises that "[r]enewal permits shall be issued in the same manner as initial permits."  OLD CODE § 26-616.  That's true, but it doesn't help their case.  Remember:  The original regime didn't require the City to issue a permit, even if the statutory requirements were met.  *Id.* § 26-615.  The plaintiffs also observe that the Constitution "limit[s] state power to terminate an entitlement whether the entitlement is denominated a 'right' or a 'privilege.'"  *Bell v. Burson*, 402 U.S. 535, 539 (1971).  But asserting that principle begs the question—the plaintiffs have not demonstrated that they had an entitlement.

*Second*, the plaintiffs' interests in their licenses were not so longstanding that they can plausibly claim custom had elevated them to property interests.[11]  STR licenses did not exist until 2017, when the City adopted its

---

[8] OLD CODE § 26-613(a); *cf. Melancon*, 703 F.3d at 273–74 (holding a taxi license was not a property interest under the Takings Clause because it was understood as a "privilege").

[9] OLD CODE §§ 26-614 (stating requirements for a STR licenses), 26-615 (providing that licenses "may issue" after the requirements were satisfied).

[10] *Id.* § 26-613(a).

[11] *Cf. Phillips*, 524 U.S. at 167 ("[A] State may not sidestep the Takings Clause by disavowing traditional property interests *long recognized* under state law." (emphasis added)).

No. 21-30643

original licensing regime. And that regime existed for only a year before the City made temporary changes to its policies, anticipating the major changes enacted in 2019. The short lifespan of the original regime shows that the plaintiffs' licenses were not so rooted in custom and practice that they amounted to property.

Together, those two factors yield one conclusion: The plaintiffs didn't have property interests in the renewal of their licenses. We thus affirm the summary judgment on this claim.

## III.

Next, the plaintiffs say the district court erred in granting summary judgment to the City on their challenge to the residency requirement. They say that the requirement violates the dormant Commerce Clause because it discriminates against interstate commerce. We agree.[12]

The Commerce Clause authorizes Congress "[t]o regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." U.S. CONST. art I, § 8, cl. 3. "Although the Constitution does not in terms limit the power of States to regulate commerce," the Supreme Court has "long interpreted the Commerce Clause as an implicit restraint on state authority, even in the absence of a conflicting federal statute."[13] Those implicit restraints apply to municipalities, too. *See, e.g.*, *C & A Carbone, Inc.*

---

[12] Once again, we must dismiss five of the plaintiffs—White Spider, Garrett Majoue, Russell Frank, Samantha McRaney, and Bob McRaney—because they lack standing. White Spider doesn't claim to own rentable property and hasn't alleged that the residency requirement injures it in other ways. Majoue, Frank, and the McRaneys have homestead exceptions, so the residency requirement isn't what caused their injuries.

[13] *United Haulers Ass'n v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 550 U.S. 330, 338 (2007); *see also Tenn. Wine & Spirits Retailers Ass'n v. Thomas*, 139 S. Ct. 2449, 2461 (2019) ("reiterat[ing] that the Commerce Clause by its own force restricts state protectionism").

No. 21-30643

*v. Town of Clarkstown*, 511 U.S. 383, 390 (1994).

"[T]wo primary principles … mark the boundaries of a [s]tate's authority to regulate interstate commerce": A state (1) "may not discriminate against interstate commerce" and (2) may not "impose undue burdens on interstate commerce." *South Dakota v. Wayfair, Inc.*, 138 S. Ct. 2080, 2090 (2018). But those principles do not apply with equal force.

If a law discriminates against interstate commerce, it is in big trouble because "[a] discriminatory law is virtually *per se* invalid." *Dep't of Revenue v. Davis*, 553 U.S. 328, 338 (2008) (quotation omitted). It may be upheld "only if it advances a legitimate local purpose that cannot be adequately served by reasonable nondiscriminatory alternatives." *Ibid.* (quotation omitted). If there are "*any* available alternative methods for enforcing [the government's] legitimate policy goals," the law is unconstitutional. *Dickerson v. Bailey*, 336 F.3d 388, 402 (5th Cir. 2003) (emphasis added).

In contrast, if a law merely imposes an incidental burden on interstate commerce, it faces much smoother sailing. Under *Pike v. Bruce Church, Inc.*, such a law will be upheld "unless the burden imposed on interstate commerce is clearly excessive in relation to the putative local benefits." *United Haulers*, 550 U.S. at 346 (plurality opinion) (alteration adopted) (quoting *Pike*, 397 U.S. at 142). "State laws frequently survive this *Pike* scrutiny, though not always, as in *Pike* itself." *Davis*, 553 U.S. at 339 (citations omitted).

The district court held that the residency requirement discriminated against interstate commerce. That was the right call. But the court then applied the *Pike* test to uphold the law. That was a mistake; it should have asked whether the City had reasonable nondiscriminatory alternatives to achieve its policy goals. Because there are many such alternatives, the residency requirement is unconstitutional under the dormant Commerce Clause.

No. 21-30643

## A.

The City's residency requirement discriminates against interstate commerce.  A law is discriminatory when it produces "differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." *United Haulers*, 550 U.S. at 338 (quotation omitted).  A law may discriminate on its face, in purpose, or in effect. *See Wal-Mart Stores, Inc. v. Tex. Alcoholic Beverage Comm'n*, 945 F.3d 206, 213 (5th Cir. 2019); *Allstate Ins. Co. v. Abbott*, 495 F.3d 151, 160 (5th Cir. 2007).  But the only form of discrimination that implicates the dormant Commerce Clause is discrimination between "substantially similar entities." *Davis*, 553 U.S. at 342 (quotation omitted).

The residency requirement discriminates on its face against out-of-state property owners.  The City doesn't just make it more difficult for them to compete in the market for STRs in residential neighborhoods; it forbids them from participating altogether.  The City prohibits anyone from using a property as an STR unless the owner has a permit.[14]  And the City does not offer permits for STRs in residential neighborhoods unless the STR is "located on the same lot of record as the owner's primary residence" and the owner has a homestead exemption for that property.[15]  The upshot is that only residents of the City may enter the market for STRs in residential neighborhoods.[16]

---

[14] NEW CODE §§ 26-615(a), 26-617(a); CZO § 20.3.LLL.1(b), (f).  In this context, "owner" means the person who owns at least 50% of an STR. *See* NEW CODE § 26-614; CZO § 20.3.LLL.3(h).

[15] NEW CODE § 26-617(c)(6)(v); CZO § 20.3.LLL.3(h).

[16] That makes *Rosenblatt v. City of Santa Monica*, 940 F.3d 439 (9th Cir. 2019), inapposite.  That case upheld an STR regulation requiring someone to live on the property full time, but that person did not need to be the owner of the property. *Id*. at 450–51.  Thus, the challenged regulation permitted out-of-staters to enter Santa Monica's STR market on

11

No. 21-30643

Residents and out-of-state property owners are also "substantially similar." *Davis*, 553 U.S. at 342 (quotation omitted). Both are private businesses, not public entities carrying out traditional government functions. *See id.* at 341–43; *United Haulers*, 550 U.S. at 342–45. And both seek to compete in the market for lodging in the City's residential neighborhoods. *See Gen. Motors Corp. v. Tracy*, 519 U.S. 278, 299 (1997). Out-of-staters want to offer the same services to the same customers in the same locations as the City's residents. The only difference between them is that one group doesn't live in the City. That means the residency requirement discriminates against interstate commerce for purposes of the dormant Commerce Clause.

The City objects to that conclusion on three grounds, but none is persuasive.

*First*, the City maintains that it did not adopt the residency requirement to protect its residents from interstate competition. Instead, it wanted to address the nuisances created by STRs by making sure that a responsible adult lived on the property full-time. But even if that account is true, the dormant Commerce Clause prohibits more than laws with protectionist purposes. It also prohibits laws that discriminate against interstate commerce on their face. *Wal-Mart*, 945 F.3d at 213. And "the purpose of, or justification for, a law has no bearing on whether it is facially discriminatory." *Or. Waste Sys., Inc. v. Dep't of Env't Quality of Or.*, 511 U.S. 93, 100 (1994). As we have already explained, the residency requirement is just such a law.

*Second*, the City observes that it allows out-of-staters to own STRs in nonresidential neighborhoods. From there, it reasons that the residency requirement does not "entirely prohibit interstate commerce" in the *citywide* market for temporary lodging. There is good reason to reject the City's mar-

equal terms as residents.

ket definition. Its own study recognized that residential STRs offer guests unique opportunities to immerse themselves in the City and have an authentic "New Orleans" experience. As the saying goes, "location, location, location" is what really matters in property markets. But in any event, even if the residency requirement merely imposes a discriminatory burden on interstate commerce, it still qualifies as discriminatory. *See, e.g.*, *Or. Waste Sys.*, 511 U.S. at 99–100.

*Finally*, the City emphasizes that the residency requirement discriminates against other Louisianans, not just out-of-staters. Residents of Baton Rouge and Shreveport are just as forbidden from participating in the STR market as are residents of Houston and Jackson. Indeed, the residency requirement even discriminates against *other residents of the City*—specifically, those who live in non-residential zones. But none of that matters. As the Supreme Court has repeatedly held, local ordinances that discriminate against interstate commerce are not valid simply because they also discriminate against intrastate commerce.[17]

*C & A Carbone* provides the most recent example. That case involved a municipality that sought to finance the construction of a new waste-transfer station. *C & A Carbone*, 511 U.S. at 386. To do so, the town let the builder run the station for five years while charging above-market prices. *Id*. at 387. The town guaranteed that the station would continue to receive waste despite the uncompetitive prices by passing a "flow control ordinance" that "require[d] all nonhazardous solid waste within the town to be deposited at the [new] transfer station." *Ibid*.

---

[17] *C & A Carbone*, 511 U.S. at 391; *Fort Gratiot Sanitary Landfill, Inc. v. Mich. Dep't of Nat. Res.*, 504 U.S. 353, 361 (1992); *Dean Milk Co. v. City of Madison*, 340 U.S. 349, 354 n.4 (1951); *cf. Brimmer v. Rebman*, 138 U.S. 78, 82–83 (1891).

A legal battle between the town and a waste-processing firm that violated the ordinance ultimately made its way to the Supreme Court. *Id*. at 387–89. The Court held that the flow ordinance violated the dormant Commerce Clause because it "deprive[d] out-of-state businesses of access to a local market"—*i.e.*, the market for processing the town's trash—and thus "discriminate[d] against interstate commerce." *Id*. at 389–90. The Court didn't care that the flow ordinance also discriminated against nonlocal trash facilities within the same state. "The ordinance is no less discriminatory because in-state or in-town processors are also covered by the prohibition." *Id*. at 391.

Thus, the fact that the residency requirement also discriminates against intrastate interests doesn't change a thing. The residency requirement still discriminates on its face against interstate commerce. That means it can be upheld only if it satisfies the dormant Commerce Clause's stringent test for discriminatory laws, not the *Pike* test.

### B.

Our conclusion that the residency requirement is discriminatory puts it on death's doorstep. Recall that "[a] discriminatory law is virtually *per se* invalid." *Davis*, 553 U.S. at 338 (quotation omitted). This case is no exception. The residency requirement can "survive only if it advances a legitimate local purpose that cannot be adequately served by reasonable nondiscriminatory alternatives." *Id*. (quotation omitted).

On appeal, the City offers three interests served by the residency requirement: preventing nuisances, promoting affordable housing, and protecting neighborhoods' residential character. There's no question that those are legitimate local purposes. But all those objectives can adequately be served by reasonable nondiscriminatory alternatives, so none of them can justify the requirement.

*First*, the City claims that the homestead requirement is necessary to

address the nuisances that were associated with STRs under the initial regime. The homestead requirement targets those problems by requiring an STR's owner to live on the premises, thus increasing the chance that nuisances are nipped in the bud and encouraging owners to rent to quieter guests in the first place.

The residency requirement might help the City achieve that goal, but there are many other reasonable alternatives that the City could adopt. Take enforcement policies. The City could step up its enforcement efforts, increasing the chance that owners face punishment for disorderly guests and strengthening their incentive to monitor their rentals. It could also increase the magnitude of penalties it imposes on owners for guests who violate quality-of-life regulations. That would similarly give owners stronger incentives to prevent nuisances and help to fund increased enforcement. The City could even strip repeat offenders of their STR licenses, thus eliminating the STRs most likely to negatively impact their neighbors.

There are also several other options beyond enforcement. For example, the City could increase taxes on STRs. That would discourage younger—and rowdier—guests from renting them and provide additional funds that could also be used to mitigate nuisances. The City could give STR owners the alternative of having an operator stay on the property during the night—thus acting as the "adult supervision" that the City ostensibly hopes live-in owners will provide.

*Second*, the City says that the residency requirement helps to preserve affordable housing. That might be true, given that the provision reduces demand—and therefore the price—for housing by restricting the number of persons who can participate in the STR market. But the City could reduce the demand for housing in other ways, such as increasing the price of an STR license for owners or capping the number of licenses available for any given

neighborhood. Moreover, if the City is serious about protecting affordable housing, there's an obvious alternative to reducing demand: increasing supply. The City could eliminate price controls, reduce housing regulations, and provide additional incentives for homebuilders to construct more housing.

Indeed, given the fact that the City itself found that "[t]here are a number of broader factors which have affected the housing market over the past decade which have led to increased costs," it's difficult to believe that it could show that residency requirement is *necessary* to address affordable housing problems. Remember that if there are "*any* available alternative methods for [achieving the government's] legitimate policy goals," the residency requirement is invalid. *Dickerson v. Bailey*, 336 F.3d 388, 402 (5th Cir. 2003). Because the City has many other options to promote affordable housing, that objective can't sustain the residency requirement.

*Finally*, the City appears to claim that the homestead requirement is necessary to preserve neighborhood character. The City's position appears to be that the old regulatory regime permitted too many housing units to be converted into rental units—thus beginning to change the residential character of some neighborhoods. But once again, there's an obvious and straightforward alternative to discrimination: cap the share of housing units that can be used as STRs. That would achieve the City's objective without engaging in discrimination, so the residency requirement is unconstitutional.

\*     \*     \*     \*

The City has many options to address the problems caused by STRs in residential neighborhoods. But it chose one the Constitution forbids. So we vacate the summary judgment for the City on this claim.[18]

---

[18] We do not reverse the judgment because the plaintiffs did not move for summary

## IV.

That leaves the City's cross-appeal.  It challenges the district court's "holding" that the plaintiffs' prior-restraint claim is "viable."  But we lack jurisdiction to resolve it because that "holding" is not a final judgment.

Recall that the plaintiffs requested a declaration and a permanent injunction in connection with their prior-restraint claim.  When they did not move for summary judgment on that claim, the district court *sua sponte* instructed the parties to brief it.  Based on that briefing, it held that the prior restraint claim was "viable."

The plaintiffs then moved for partial entry of judgment under Rule 54(b) on all their claims, save their requests for attorneys' fees under 42 U.S.C. § 1988.  The district court granted that motion in an order that stated that it had "decided" the plaintiffs' prior restraint claims.  The court also entered a "judgment" that "dismissed" all of their claims "except for any 42 U.S.C. [§] 1988 claims arising from First Amendment prior restraint violations."  But that judgment did not grant the plaintiffs a declaration or a permanent injunction, as they had requested in their complaint.

As relevant here, we have jurisdiction to review only "final decisions of the district courts."  28 U.S.C. § 1291.  Although the district court called its order a "judgment," its label does not determine finality.  *Sullivan v. Finkelstein*, 496 U.S. 617, 628 n.7 (1990).  Instead, "[a] final decision is one by which a district court disassociates itself from a case" and "terminate[s] an action."  *Gelboim v. Bank of Am. Corp.*, 574 U.S. 405, 408–09 (2015) (quotations omitted).  Accordingly, a final order must also specify the *remedies* that the victorious plaintiffs will receive.[19]  Because the judgment did not

judgment in the district court.

[19] *See Riley v. Kennedy*, 553 U.S. 406, 419 (2008) ("We have long held that an order

17

resolve the plaintiffs' requests for a declaration or permanent injunction, it is not final for purposes of § 1291.

The story is the same even if we generously construed the district court's "holding" as a declaration. The plaintiffs' request for a permanent injunction would still remain. For a claim to be final after being severed under Rule 54(b), a district court must have "disposed of that claim *entirely*."[20] And that means that if some of the plaintiff's requests for relief are "left unresolved," the district court's order is not yet final.[21] Hence, we previously have rejected claims of finality when a district court granted a declaration but failed to resolve the plaintiff's requests for other relief.[22] So too here.

---

resolving liability without addressing a plaintiff's requests for relief is not final."); *see also* 15B Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 3914.28 (2d ed.), Westlaw (Apr. 2022 update) ("[A] summary judgment that determines liability but leaves damages or other relief open for further proceedings is not final.").

[20] *Tetra Techs., Inc. v. Cont'l Ins. Co.*, 755 F.3d 222, 228 (5th Cir. 2014) (quotation omitted and alteration adopted). Note, however, that a plaintiff's request for costs and attorneys' fees "does not prevent . . . [a] judgment from becoming final for purposes of appeal." *See Ray Haluch Gravel Co. v. Cent. Pension Fund of Int'l Union of Operating Eng'rs*, 571 U.S. 177, 179 (2014).

[21] *Liberty Mutual Ins. Co. v. Wetzel*, 424 U.S. 737, 740–42 (1976); *see also* 15B Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 3915.2 (2d ed.), Westlaw (Apr. 2022 update) ("Partial determinations of relief do not establish finality any more than a determination of liability alone."). Granted, *Wetzel*'s discussion of that issue is only *dicta* under binding precedent. *See United States v. Miss. Power & Light Co.*, 638 F.2d 899, 904 (5th Cir. Unit A Mar. 1981). Still, as *dicta* from a unanimous Supreme Court, it is entitled to great weight. *Cf. Campaign for S. Equal. v. Bryant*, 791 F.3d 625, 627 n.1 (5th Cir. 2015).

[22] *See Lucas v. Bolivar Cnty.*, 756 F.2d 1230, 1234–35 (5th Cir. 1985) (per curiam). A later case suggests that a declaration can be immediately reviewable even when a district court has not addressed all forms of relief requested by the parties. *See St. Paul Mercury Ins. Co. v. Fair Grounds Corp.*, 123 F.3d 336, 338 & nn.5, 9 (5th Cir. 1997). But *Lucas* predates that case and therefore controls. *Newman v. Plains All Am. Pipeline, L.P.*, 23 F.4th 393, 400 n.28 (5th Cir. 2022). And although *Lucas*'s analysis of that issue is an alternative hold-

Given our suspicions that we lacked jurisdiction, we asked the parties to be prepared to discuss this issue at oral argument. There, the City appeared to concede that the district court's order was not final because it had not resolved the plaintiffs' requests for relief. So far, so good.

But the City then claimed that even if the district court's holding were not final, we nonetheless have appellate jurisdiction to review whether it had jurisdiction over the case. It maintained that we have recognized as much in *International Association of Machinists, Local 2121 v. Goodrich Corp.*, 410 F.3d 204 (5th Cir. 2005). But that case said no such thing. *Goodrich* noted that even if we "[a]rguably" had that sort of appellate jurisdiction, it was not implicated in that case because the district court did not "wholly lack[ ] jurisdiction." *See id.* at 211–14. Because that case merely assumed, for the sake of argument, that such jurisdiction existed, its discussion is *dicta*. Today, we hold that we have no interlocutory appellate jurisdiction for policing a district court's jurisdictional holdings beyond what this court or the Supreme Court has already recognized.[23] And that means we do not have jurisdiction over the City's cross-appeal.

The judgment is AFFIRMED in part and VACATED in part. The cross-appeal is DISMISSED for want of jurisdiction.

---

ing, "[t]his circuit follows the rule that alternative holdings are binding precedent and not obiter dictum." *Texas v. United States*, 809 F.3d 134, 178 n.158 (5th Cir. 2015) (quotation omitted), *aff'd by an equally divided Court*, 579 U.S. 547 (2016).

[23] *See, e.g.*, *Shepherd v. Int'l Paper Co.*, 372 F.3d 326, 328–29 (5th Cir. 2004) (citing *Phillips v. Negley*, 117 U.S. 665, 671–72 (1886), for the rule that we have jurisdiction to review whether a district court had jurisdiction to vacate a judgment).